IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DANIEL N. STEARNS, | |
| *Plaintiff*, | Civil Action |
| vs. | |
| The BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF COWLEY, KANSAS, *et al*. | No. 07-CV-01145-MLB |
| *Defendants*. | |

**RULE 56(f) AFFIDAVIT IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS CITY OF WINFIELD, DEVORE, CLARKSON, "JOHN DOE," AND "RICHARD DOE"**

Affiant states:

### A. Procedural Background

1.  This is primarily a § 1983 federal civil rights action brought by Daniel Stearns against Cowley County, the City of Winfield, and county and city law enforcement officers for arresting Stearns without a warrant and without probable cause and for strip searching him for no legitimate reason and in front of a group of law enforcement on-lookers, all in violation of the Fourth Amendment.

2.  The action was filed on May 23, 2007. All the defendants answered by July 23, 2007.

3.  On August 21, 2007, the parties submitted a Report of Parties' Planning Meeting to Magistrate Judge Karen Humphreys pursuant to Fed. R. Civ. P. 26(f). In the report, the parties requested that discovery last six months, until February 29, 2008, and requested that the deadline for summary judgment motions be 14 days after the final pretrial conference. One of the reasons the parties requested a six-month discovery period was, "The identity of three defendants is not yet

known." The unknown defendants were named in the Complaint as John Doe, Richard Doe, and Doe Surety Company.

4. On August 29, 2007, Judge Humphreys issued a scheduling order. The order set the discovery deadline requested by the parties, February 29, 2008, and set a summary judgment motion deadline of April 4, 2008.

5. Between August 29 and October 15, 2007, the parties exchanged initial disclosures. At the plaintiff's urging, the parties scheduled the depositions of five defendants; Tom Campbell, Jeff Elston, Randy Topper, Gary Tucker, and Floyd Clarkson. The deposition notices for each are attached as Exhibits A through E. The plaintiff also attempted via email to schedule with the defendants the deposition of two witnesses, Donna Venable and Rachael Warren.

The plaintiff issued interrogatories and requests for production to nine defendants; Bob Odell, Tom Campbell, Jeff Elston, Doug Allison, Randy Topper, Gary Tucker, Steven Deill, Jerry DeVore, and Floyd Clarkson. The interrogatories and requests for production asked for, among other things, information on (1) the policies and procedures of the Winfield Police Department and Cowley County Sheriff's Department regarding when and how to conduct an arrest and strip search, and (2) the defendants' training on when and how to conduct an arrest and strip search. The interrogatories are attached as Exhibits F through N. The requests for production are attached as Exhibits O through W.

6. On October 15, 2007, just a month-and-a-half after discovery started, the City of Winfield, Jerry DeVore, Floyd Clarkson, "John Doe," and "Richard Doe" (the Winfield defendants) filed a motion for summary judgment on all the plaintiff's claims and a motion to suspend all discovery until a ruling on their summary judgment motion.

7. On October 19, 2007, the remaining defendants (the Cowley County defendants) filed a

motion to stay discovery until a ruling on their summary judgment motion, yet to be filed but to be filed soon.

8.   The defendants then told the plaintiff they would resist all efforts at discovery until a ruling on their motions to stay discovery, including the taking of any depositions, even those already scheduled, and answering any interrogatories or requests for production, even those already served.

9.   The actions of the defendants have blocked the plaintiff from conducting any discovery in this case.

**B.  Response to Defendants' Statement of Facts**

Listed below are the paragraphs in the defendants' statement of uncontested facts that actually contain disputed facts.  For each paragraph, the plaintiff has stated what facts are in dispute and the discovery needed.

**Paragraph 1.**  Stearns was held for six hours, not five.  The Cowley County Jail has 16 closed-circuit video cameras.  The video from each of these cameras is recorded and the recording is time stamped.  The video recording from the night Stearns was arrested shows; (1) he was strip searched at about 5:00 p.m., (2) his clothes were taken and he was given a jumpsuit to wear, (3) he was locked in a holding cell by himself for over five hours, (4) at about 10:40 p.m., he was finally booked, and (5) he was released at about 11:10 p.m.  (Video of Strip Search, Ex. X.)

**Paragraph 10.**  Plaintiff did allege in the Complaint that the unknown defendants John Doe and Richard Doe were Winfield Police Officers.  However, counsel for Defendant Sheriff Bob O'Dell has since indicated that "John Doe" and "Richard Doe" are actually Cowley County Sheriff Detention Deputies Steve Bumpus and Roger Dobbs.

DISCOVERY NEEDED: One of the reasons for the scheduled depositions of Tom Campbell, Jeff Elston, Randy Topper, Gary Tucker, and Floyd Clarkson was to confirm the identities of John

Doe and Richard Doe.

**Paragraph 11.** Daniel Fruits was not shot and killed after a robbery. He was shot and killed after he grabbed a small cash register off the counter at a tobacco shop and ran out of the store. It was not a robbery. No force or threat of force was involved. A copy of the store clerk's 911 call confirming this is attached as Exhibit Y. Additionally, Fruits was not killed by an officer in hot pursuit. He was shot on a dead end road after exiting the passenger side of a Jeep Cherokee and while standing next to the Jeep surrounded by police officers. A video recorded on a police dashboard camera showing the shooting is attached as Exhibit Z.

**Paragraph 13.** Stearns never made any threat against any Winfield or Cowley County law enforcement officer at any time including while in O'Kelly's Bar. On March 24, 2006, Winfield Police Department Investigator Chad Gordon investigated the 911 phone call by Blake Porter. He interviewed Porter at O'Kelly's. Porter told Gordon that he had never heard Stearns make "any threats to do anything to the Police Department or any of its officers." In his report, Gordon stated:

> Mr. Porter indicated that he recalled the person (Stearns) making general comments that he was down on the Winfield Police Department for what they had done to his dad. He did not recall specific comments made about the Police, but did remember him referring to them as "pigs".

> I asked Mr. Porter if he ever heard the person (Stearns) made [sic] any threats to do anything to the Police Department or any of its officers. He told me that he did not recall any threats being made.

(Report of Chad Gordon, Ex. AA.)

**Paragraph 14.** An investigation of Porter's 911 call was made, but not until after Stearns was arrested on March 23, 2006. It looks like Chad Gordon's investigation and report were part of an attempt by the Winfield Police Department to justify Stearns' arrest after the fact. In the first paragraph of his report, Gordon stated:

4

On March 24, 2006 this case was created to document some information that had been reported to the Winfield Police Department about some threats that had been made by [an] individual (Daniel Stearns) toward the Police Department and/or Officers.  At the time that the threats were made, a report was not deemed as being necessary.  But due to recent events, it was decided to create a report to have a permanent record to document the threats that were overheard.

At the time Stearns was arrested, few people from the police department even knew about the 911 phone call from O'Kelly's Bar.  The first thing Gordon had to do in his investigation was find out how the police department had actually received any information on possible threats, because no one at the police department seemed to know.  In his report, Gordon stated:

Upon being told this and the decision being made to create this case, I began by trying to determine how this information became available to the Police Department.  I was informed that Blake Porter, a member of management for OKellys' Bar was the person who had called the Police Department to report the information.  I was also told that either Denny Wilkerson or Byron Bumgarner was the dispatcher that was working the night that this information came into the Police Department.  I was told that the information possibly came to the Police Department on Saturday (March 18th).  By reviewing the Dispatch Schedule, it appears that Margaret Tanner was working on Second Shift and Byron Bumgarner was working on Third Shift.

(Ex. AA.)

DISCOVERY NEEDED: The defendants have prevented the plaintiff from conducting any discovery in this case including deposing Chad Gordon and asking him why Blake Porter's 911 phone call was completely forgettable for six days and extremely important after seven days.

**Paragraph 17.**  Stearns may have used profanity when speaking to Ryan Walker about the police shooting and killing his father, but he never raised his voice to Walker, never threatened Walker, and never acted aggressive towards Walker.  Rather, he cooperated with Walker.  Walker's report contradicts the defendants' characterization of the traffic stop.  Walker states in his report:

On March 21, 2006 while on patrol, I was running lidar south of town on US 77.  I caught a tan colored Chevy going 53 mph in a 45 mph zone.  I pulled the vehicle over and made contact with a white male driver named Daniel Stearns

> according to his driver's license.  Mr. Stearns started the contact being very rude not
> giving his license to me when I asked.  I asked Mr. Stearns if he went to school in
> Winfield, and he replied that he was her[e] in town to [sic] because "we killed his
> fucking dad."  I asked who his father was, and he told me that it was Danny Fruits.
> He then changed his attitude and became polite with me the rest of the traffic stop.
> I then gave him a verbal warning for his traffic violation, and Mr. Stearns drove south
> to Arkansas City.

(Ex. BB.)  Walker never suggests that Stearns ever raised his voice or was aggressive in any way.

Rather, he admits that Stearns became "polite" after Walker asked about Stearns' father.

Walker's report looks like another part of an attempt by the Winfield Police Department to

justify Stearns' arrest after the fact.  Unlike other narrative reports, Walker's report is not dated.

Chad Gordon notes in his report that Walker had some interaction with Stearns but claims Walker

did not write a report:

> There was another incident where some threats were said in the presence of Officer
> Ryan Walker as well.  At this moment, a case has not been created to document that
> incident.

(Ex. AA.)  Clearly, Walker wrote his narrative report long after he stopped Stearns on March 21,

after Stearns was arrested on March 23, and after Gordon wrote his narrative report, sometime after

March 24, 2006.

DISCOVERY NEEDED: The defendants have temporarily stopped the plaintiff from

conducting any discovery in this case including deposing Ryan Walker and asking him why he wrote

a narrative report on a routine traffic stop conducted without incident and why he wrote it more than

seven days after the stop.

**Paragraph 19.**  Stearns did not pound on anyone's door.  The first line of Greg Venable's

narrative report states, "On March 23, 2006 at approximately 1:00 a.m., my wife called me from our

residence at 806 E. 13th Ave. to tell me that someone was *knocking* on the door and ringing the

doorbell."  (Ex. CC) (emphasis added).

**Paragraph 20.**  Donna Venable never told her husband that she heard the word "later."  As to what Donna Venable told him on the phone, Greg Venable wrote in his report:

> I was still on the phone with my wife and she told me that it was a white male with some type of red and white jersey on.  As I was leaving the police station, my wife told me that the male walked back to his car that was parked in my driveway, and drove off west bound on 13th Ave.  She told me that it was gold colored, 4 door passenger car and that it was a newer model.  I relayed this information to the other units.

(Report of Greg Venable, Ex. CC.)

The defendants have admitted that Donna Venable never answered the door and Stearns and Donna Venable never spoke to each other.  By the time Donna Venable got to the door, Stearns was already walking away.  (Answer at 4.)

DISCOVERY NEEDED: As to ¶¶ 19 and 20, the defendants have stopped the plaintiff from conducting any discovery in this case including taking the depositions of Donna or Greg Venable to (1) find out what Donna Venable actually told Greg Venable on the phone the night in question and (2) ask Greg Venable to explain the discrepancies between his narrative report and the claims he has made in the defendants' motion for summary judgment.

**Paragraph 21.**  Greg Venable mentions nothing in his report about his wife describing "big square tail lights."  (Ex. CC.)

**Paragraph 22.**  It is possible Donna Venable was alarmed and frightened.  However, she did not say anything about being alarmed or frightened in her statement to the police, and Greg Venable did not mention anything in his report about Donna Venable acting alarmed or frightened.  (Witness Statement of Donna Venable, Ex. DD; Report of Greg Venable, Ex. CC.)

DISCOVERY NEEDED: The Defendants have produced no statement by Donna Venable in which she says she was alarmed or frightened.  The defendants have stopped the plaintiff from

taking the depositions of Donna and Greg Venable to find out (1) if Donna Venable was alarmed or frightened, and (2) why Greg Venable has now concluded that Donna Venable was alarmed or frightened.

**Paragraph 28.**  It is clear from Greg Venable's report that he did not notice the driver of the gold car was wearing a red and white jersey until the driver pulled into a driveway, parked, and got out of the car.  He states in his report:

> At approximately 3:38 am I was at the stop light at 9th Ave and Bliss St. when I noticed a car similar to the one I saw by my house earlier in the night.  I got behind the vehicle and it was the same one from earlier.  I knew this because I still had the tag number written on my hand.  I ran the number through dispatch and it came back to Nelda Coplen, from Sweetwater, Texas.  About the time I got the tag return back, the car pulled into the driveway of a house on the northeast corner of 11th Ave and Andrews St.  I turned around and came back by and there was a white male standing by the road, and the first thing that I noticed was that he was wearing a red and white jersey.

(Ex. CC.)

**Paragraph 31.**  The defendants' characterization of Venable's encounter with Stearns is contradicted by Venable's report.  Stearns had a discussion with Greg Venable about the police shooting and killing Stearns' father and used profanity in that discussion but never raised his voice to Venable, threatened Venable, or acted aggressive towards Venable.  Rather, he cooperated with Venable.

In his report, Greg Venable never claimed that Stearns raised his voice or acted aggressive. Rather, Venable noted that Stearns commiserated with Venable, telling Venable that "he was in town to bury his dad" and stating, "You can't talk about [the shooting], can you?"  (Ex. CC.)  Venable also noted that Stearns was cooperative.  Venable "asked [Stearns] if I could see his ID and he gave it to me."  He "asked [Stearns] see who lived in the house that he was at and he told me that it was his grandparents."  Before leaving, Venable "thanked [Stearns] for his cooperation."  (Report of Greg

Venable, Ex. CC.)

     **Paragraph 32.**  Again, Stearns used profanity when speaking to Greg Venable but never raised his voice, acted aggressive, or abused Venable verbally or otherwise.  Stearns did not grow up in Winfield.  He was a visitor and did not know the area very well.  When Venable asked Stearns if he had been on east 13th Avenue during the night, Stearns honestly did not know.  Venable's house is on the corner of 13th Avenue and Maris Street.  Stearns knew he had been on Maris but did not think he had been on 13th Avenue.  Stearns told Venable to mind his own business because he thought he had not done anything wrong and was being harassed.

     **Paragraph 36.**  Clarkson certainly operated under the belief that Christopher Smith had ordered Stearns' arrest.  When Clarkson was handcuffing Stearns, he told Stearns "that at the direction of the Cowley County Attorney, he was being placed under arrest for Disorderly Conduct." (Report of Floyd Clarkson, Ex. EE.)  When Stearns' grandmother asked what was going on, Clarkson "told her again that [Stearns] was being booked into the county jail on a charge of Disorderly Conduct at the direction of the Cowley County Attorney."  (Report of Floyd Clarkson, Ex. EE.)

     DISCOVERY NEEDED: The defendants have stopped the plaintiff from conducting any discovery including taking the deposition of Christopher Smith.  Without taking Smith's deposition, the plaintiff can only say that Clarkson in his report points to Smith as the one who ordered Stearns' arrest.

     **Paragraph 38.**  Please see the plaintiff's answer to ¶ 39.

     **Paragraph 39.**  As to ¶¶ 38 and 39, the police reports on Stearns' arrest contradict the claim that Jerry DeVore was somehow involved.  Clarkson states in his report that he received his order to arrest Stearns from someone named Kurt Weber after Weber spoke with Christopher Smith.

Clarkson says he "received a page sent from the Winfield Police Department that stated the following: Kurt (Weber) talked with Chris Smith, if anyone comes into contact with Daniel N. Stearns go 10-15 (arrest) for Disorderly from the case at 322's (Officer Venable) house last night." (Ex. EE.)  No one ever mentions DeVore in any report.

DISCOVERY NEEDED: As to ¶¶ 38 and 39, the defendants have stopped the plaintiff from conducting any discovery in this case including taking the deposition of Jerry DeVore.  In response to the defendants' claim that DeVore was somehow directly involved with Stearns' arrest, the plaintiff can only say at this point that police reports indicate the opposite, that DeVore was not involved in Stearns' arrest in any way.

**Paragraph 40.**  Please see the plaintiff's answer to ¶ 41.

**Paragraph 41.**  As to ¶¶ 40 and 41, it may very well be true that the Winfield Police Department had a practice of arresting people and just assuming that the Cowley County Attorney had obtained a warrant.  However, if such a custom did exist, it was contrary to § 3.24 of the Winfield Police Department Rules and Regulations which states:

> Whenever possible, a warrant will be obtained prior to making an arrest. When a valid warrant is placed in the hands of an officer for execution, it is his/her duty to carry out its demands without delay.

(Ex. FF.)

DISCOVERY NEEDED: Before the defendants filed their motions to stay discovery, the plaintiff served interrogatories on Jerry DeVore asking him to "*Identify* every written Winfield, Kansas, Police Department rule, regulation, policy, or procedure that was in effect on March 23, 2006, regarding when, where, or how to conduct an arrest," and "*Identify* every oral Winfield, Kansas, Police Department rule, regulation, policy, or procedure that was in effect on March 23, 2006, regarding when, where, or how to conduct an arrest."  (Ex. J.)  DeVore has refused to answer

these interrogatories until the Court rules on his motion to stay discovery.  Without answers to those interrogatories, the plaintiff cannot say whether the practice of the Winfield Police Department was as the defendants claim.

    **Paragraph 42.**  Please see the plaintiff's answer to ¶¶ 38 and 39.

    **Paragraph 43.**  The reports Jerry DeVore claims he relied on were written after Stearns was arrested.  Please see the plaintiffs answer to ¶¶ 14 and 17.

    DISCOVERY NEEDED: Again, the plaintiff has not been afforded the opportunity to depose DeVore.

    **Paragraph 45.**  It may be true that Clarkson assumed the county attorney had determined there was probable cause to arrest Stearns.

    DISCOVERY NEEDED: The plaintiff cannot know what Clarkson assumed without deposing him.  The plaintiff had Clarkson's deposition scheduled, but it was cancelled by the defendants.

    **Paragraph 46.**  It may be true that the Winfield Police Department had a habit of arresting people and just assuming that the Cowley County Attorney had obtained a warrant.  However, if the custom described by Clarkson did exist, it was inconsistent with § 3.24 of the Winfield Police Department Rules and Regulations.  (Ex. FF.)  Please see the plaintiff's answer to ¶ 41.

    DISCOVERY NEEDED: Before the defendants filed their motions to stay discovery, the plaintiff served on Clarkson interrogatories asking him to "*Identify* every written Winfield, Kansas, Police Department rule, regulation, policy, or procedure that was in effect on March 23, 2006, regarding when, where, or how to conduct an arrest," and "*Identify* every oral Winfield, Kansas, Police Department rule, regulation, policy, or procedure that was in effect on March 23, 2006, regarding when, where, or how to conduct an arrest." (Ex. H.) Clarkson has refused to answer these

interrogatories before the Court rules on his motion to stay discovery.  Without answers to those interrogatories, the plaintiff cannot say whether the practice of the Winfield Police Department was as the defendants claim.

**Paragraph 48.**  Clarkson is falsely stating that he relied on Ryan Walker's report.   In his report, Clarkson states that he reviewed "a supplemental narrative of a traffic stop conducted by Officer Ryan Walker on Mr. Stearns on 03/21/06" before the arrest, but Walker did not write that report until days after Stearns was arrested.  (Report of Chad Gordon, Ex. AA.)  Clarkson is also falsely stating that he relied on Blake Porter's 911 call.  In his report, Clarkson included a litany detailing all the information he claimed he had at the time he arrested Stearns.  Porter's 911 call is not even mentioned.  (Ex. EE.)  Chad Gordon's report shows that hardly anyone at the police department knew about the 911 call at the time Stearns was arrested.  (Ex. AA.) Clarkson must have written his report before it was decided the 911 call would be a basis for Stearns' arrest.

What Clarkson probably did know at the time he arrested Stearns was that Donna Venable had reported to her husband someone "knocking on the door and ringing the doorbell," not pounding.  (Report of Greg Venable, Ex. CC.)  He also probably knew that Donna Venable never answered the door, Stearns and Donna Venable never spoke to each other, and by the time Donna Venable got to the door, Stearns was already leaving.  (Answer at 4.)  Further, Clarkson probably knew that when Greg Venable approached Stearns, he did not raise his voice, act aggressive, or threaten Venable.  Rather, he cooperated with Greg Venable by giving Venable his drivers license and answering Venable's questions about who owned the home where Stearns was staying.  (Report of Greg Venable, Ex. CC.)

DISCOVERY NEEDED: To ask Clarkson about what he knew when, the plaintiff scheduled his deposition.  The defendants cancelled that deposition.

**Paragraph 50.**   Stearns never approached any Cowley County Deputies' patrol car, especially one parked in or around a residence.  And, Campbell never told Clarkson that the incident at Campbell's house concerned "a man meeting the description of Stearns."  Clarkson's report states instead:

> When Deputy Campbell arrived, he stated that earlier in the afternoon, he had his patrol car parked at his residence but he was away from the house.  He stated that his daughter came out of the residence and saw a white male wearing a bandana on his head, had gotten out of a tan extended cab small size pickup truck and was in the process of approaching his patrol car.  When the subject saw Deputy Campbell's daughter, he ducked his head and returned to the pickup truck and left the area. *Deputy Campbell said he wondered if this incident and the incident at Officer Venable's residence were connected in any way.*

(Ex. EE) (emphasis added).  It is clear Clarkson and Campbell had no idea if the incident at Campbell's house was connected to Stearns in any way.

DISCOVERY NEEDED: The plaintiff had Campbell's deposition scheduled to find out just what happened at his residence.  The defendants cancelled that deposition.

**Paragraph 51.**   According to Greg Venable, Stearns told Venable that he knew the person who shot his father was "probably Dougherty or Knoles."  (Report of Greg Venable, Ex. CC.)  David Dougherty and Mark Knoles were and are both Winfield Police Department officers.

**Paragraph 53.**   Clarkson had no good faith belief that the Cowley County Attorney had determined there was probable cause for the arrest of Stearns.  Clarkson never asked if the county attorney had determined whether there was probable cause to arrest Stearns or sought a warrant.  He just followed the county attorney's order.  What Clarkson did could be called blind faith.  It could be called willful blindness, but it was not good faith.

Clarkson's blind faith contravened § 3.24 of the Winfield Police Department Rules and Regulations.  Please see the plaintiff's answer to ¶ 41.

**Paragraph 54.**  Please see the plaintiff's answer to ¶¶ 48 and 50.  Clearly, Clarkson never thought about whether there was probable cause to arrest Stearns for disorderly conduct.  He was ordered by Christopher Smith to arrest Stearns for disorderly conduct and he did so.

**Paragraph 55.**  The facts contradict Clarkson's claim he relied on a belief that Stearns would injure himself or another or damage property unless immediately arrested.  Greg Venable and Master Patrolman Gary Bortz spoke with Stearns at his grandmother's home around 4:00 a.m. on March 23, 2007, about 13 hours before he was arrested.  They decided Stearns did not need to be arrested immediately.  (Report of Greg Venable, Ex. CC.)  At 11:23 a.m., Clarkson received the page from Kurt Weber stating, "if anyone comes in contact with Daniel N. Stearns go 10-15 (arrest)."  No one, including Clarkson, went out then to immediately arrest Stearns out of a fear that he would harm himself or others.  (Report of Floyd Clarkson, Ex. EE.)  Between 11:23 a.m. and 4:00 p.m. when Clarkson reported for duty, no one sought a warrant for Stearns' arrest, thinking him an immediate danger.  When Clarkson reported for duty, he did not immediately go out and arrest Stearns.  He waited an hour.  (Report of Floyd Clarkson, Ex. EE.)

The reality is, there was no probable cause to believe Stearns would hurt anyone or damage any property unless he was immediately arrested.  Stearns had never damaged any property or hurt anyone before.  And, he had cooperated with Officers Greg Venable and Ryan Walker in his encounters with them.

DISCOVERY NEEDED: The defendants have temporarily blocked the plaintiff from taking Clarkson's deposition on this issue and others.

**Paragraph 56.**  Please see the plaintiff's answer to ¶¶ 48, 50, and 55.

**Paragraph 59.**  Clarkson states he did not draw his weapon when he arrested Stearns.  What Clarkson does not mention is that some or all of the officers Clarkson was with were displaying

14

assault rifles.  (Decl. of Elan Kittelson, Ex. GG.)

DISCOVERY NEEDED: The plaintiff had scheduled officers' depositions on this issue but they were cancelled by the defendants.

**Paragraph 61.**  Clarkson was not forced to participate in an illegal arrest with other officers who were exhibiting assault rifles.  He chose to.

**Paragraph 68.**  Stearns did not resist, so no real force was necessary to place him in handcuffs.  However, the plaintiff cannot agree that Campbell and Clarkson used "as little force as reasonably possible."  Stearns is not claiming that the officers used excessive force in handcuffing him.

**Paragraph 69.**  Clarkson states in his report:

As I was leaving on Andrews street along the west side of the residence at 503 E. 11th, I observed a tan colored, extended cab Dodge Dakota pickup which was parked in the driveway behind a gold colored 4-door Chevy.

(Ex. EE.)

The Dodge Dakota pickup Clarkson saw was not tan colored.  It was silver.  The truck belonged to Randy and Gretchen Kittelson, Stearns' aunt and uncle.  502 East 11th Avenue is the home of Stearns' grandmother and grandfather.  Randy and Gretchen's son, 28-year-old Elan Kittelson, drove the truck over to 502 East 11th Avenue earlier in the afternoon to see his grandparents.  The truck was distinctive.  It had badly peeling paint, a Pittsburg State University license plate, and Pittsburg State University stickers stuck on it.  It did not match at all the description of the tan truck Campbell gave Clarkson earlier that day.

Elan had the truck all day March 23, 2007.  No one else drove it.  He drove his mother to work in the truck around 7:30 a.m., and drove her back home in the truck around 1:30 p.m.  Then, he drove the truck to his grandparents home.  From then until Stearns was arrested, the truck was

parked at 502 East 11th Avenue and Elan had the keys.  Stearns never drove the truck or asked to

drive the truck.  Elan and Stearns look nothing alike.  (Decl. of Elan Kittelson, Ex. GG.)

**Paragraph 72.**  Stearns did not say to Campbell, "You know I am going to take care of

business now," (although even that does not appear to be a threat of physical violence).  Stearns

actually said, "You know I take care of business," meaning that he paid his bills and taxes, did his

job, did not bother anyone, and did not deserve to be arrested.  Campbell never told Clarkson he

believed Stearns had uttered "a threat to harm officers at the Jail."  Clarkson would certainly have

put that in his report, and it is not there.  (Ex. EE.)

DISCOVERY NEEDED: The plaintiff does not know what Campbell told Clarkson at the

jail because the defendants have stopped the plaintiff from taking the deposition of Campbell or

Clarkson.

**Paragraph 75.**  Clarkson certainly did not go to the holding cell where the strip search was

going to be conducted just to retrieve his handcuffs.  On the video of the strip search, Clarkson is

one of the first in the cell, and he is one of the last out.  He stays in the cell after his handcuffs are

removed.  He stays in the cell after all of Stearns's clothing is removed.  He stays in the cell while

Stearns is strip searched in front of several other officers.  (Video of Strip Search, Ex. X.)

It also does not appear that Campbell asked Clarkson to assist out of a concern for officer

safety either.  Clarkson does not say anything about this in his report.  However, Clarkson does not

say anything in his report about participating in the strip search at all.  He skips right over it.  After

describing how he "assisted in escorting Mr. Stearns into the jail,"  Clarkson concludes his report,

"After providing the jail staff with all the necessary information on Mr. Stearns, I returned to the

Winfield Police Station to complete my report."  (Ex. EE.)  By failing to mention in his report that

he was involved in the strip search of Stearns, Clarkson violated § 3.31 of the Winfield Police

Department Rules and Regulations.  (Ex. HH.)  That section states in part:

> Any officer that witnesses a body cavity search or conducts a strip search will note the following items in a written report.
>
> A.    The name and sex of the person searched.
> B.    The name and sex of the person conducting the search.
> C.    The date, time, and place of the search.
> D.    A statement of the results of the search.

Clarkson's ability to accurately recall the circumstances surrounding the strip search are in serious doubt.  In ¶¶ 85 and 86 of the defendants' statement of facts, Clarkson claims he initially denied being at the strip search of Stearns because "he did not recall that Stearns was strip searched when he was present at the Jail" until after he watched the video tape of the search.  Now, Clarkson claims he remembers the strip search but claims in ¶¶ 79 and 80 of the defendants' statement of facts that he cannot recall whether he actually touched Stearns during it.  Clarkson says he specifically remembers Campbell asking that he assist out of a concern for officer safety but claims in ¶ 76 of the defendants' statement of facts that he did not know he was going to be participating in a strip search.

DISCOVERY NEEDED: The plaintiff does not know what Campbell told Clarkson because the plaintiff has not been afforded the opportunity to depose either of them.

**Paragraph 76.**  Please see the plaintiff's answer to ¶ 75.  Campbell asked Clarkson to participate in something for reasons of officer safety.  That something ended up being a strip search.  At the strip search, Clarkson did not object.  He did not leave.  He was one of the first officers into the holding cell and one of the last out.  (Video of Strip Search, Ex. X.)

DISCOVERY NEEDED: The plaintiff requires a deposition to ask Clarkson about inconsistencies concerning his report, the video of the strip search, and the claims he has made in the defendants motion for summary judgment.

17

**Paragraph 77.**  The video of the stip search shows seven different officers involved.  There was absolutely no legitimate reason to have seven officers involved in the strip search of Stearns who had cooperated with Officers Walker and Venable in the past and had been complying with all the commands given by Officers Campbell and Clarkson including their request that he come out of his grandmother's home and put his hands on the wall.  The strip search was conducted by a group of officers for no other reason but to humiliate and degrade Stearns.

The strip search violated § 3.31 of the Winfield Police Department Rules and Regulations which states, "All [strip] searches will be done in as private a manner as possible thereby preserving the dignity of the person searched."  (Ex. HH.)

DISCOVERY NEEDED: The plaintiff scheduled the depositions of five of the officers involved in the strip search, but those depositions were cancelled by the defendants.

**Paragraph 78.**  Stearns was *ordered* by officers to remove his clothes and he complied with that order as he had complied with all orders given to him by officers.

**Paragraph 79.**  Clarkson's statements about what he remembers are inconsistent and not credible.  Please see the plaintiff's answer to ¶ 75.

DISCOVERY NEEDED: The plaintiff does not know what Clarkson recalls but needs to depose him about his selective memory.

**Paragraph 80.**  Please see the plaintiff's response to ¶¶ 75 and 79.

**Paragraph 81.**  After retrieving his handcuffs, the video of the strip search shows Clarkson stayed and was one of the last officers out of the cell after the stip search concluded.  (Ex. X.)

**Paragraph 83:** It may be true that Clarkson was the only Winfield Police Department officer present for the strip search.

DISCOVERY NEEDED: Without taking the depositions of the officers involved in the strip

search and asking them to identify themselves, there is no way for the plaintiff to know whether Clarkson was the only Winfield Police Department officer present.

**Paragraph 85.**  Please see the plaintiffs answer to ¶¶ 75 and 79.

**Paragraph 86.**  Please see the plaintiff's answer to ¶ 75 and 79.

**Paragraph 87.**  Please see the plaintiff's answer to ¶¶ 75 and 79.  There was no "concern that Stearns could be concealing a weapon."  Clarkson and Campbell were so confident that Stearns did not have a weapon, they did not even search his pockets before he was placed in Campbell's patrol car for transport to the jail, thereby violating § 3.26 of the Winfield Police Department Rules and Regulations entitled *Transportation and Booking of Prisoners*.  (Ex. KK.)  The first sentence of that section states, "Prior to transporting any prisoner, a thorough search for any weapons and/or contraband will be initiated."

**Paragraph 88.**  Clarkson is falsely claiming he wrote his narrative report on the arrest of Stearns "on the same or next day."  Unlike other narrative reports, Clarkson's narrative report is not dated, and it references a report by Ryan Walker that did not exist until after March 24, 2006.  (Report of Chad Gordon, Ex. AA.)

DISCOVERY NEEDED: The plaintiff does not know when Clarkson wrote his narrative report and cannot know until the plaintiff is allowed to take his deposition.

**Paragraph 89.**  No one forced Clarkson to participate in an illegal strip search.  He chose to.

### C.  Additional Facts

1.  Stearns went to Donna Venable's door by mistake.  He was actually looking for the house catty-corner to the Venables.  Rachael Warren, the woman Stearns was with that night, confirms this. An audio recording of her interview is attached as Exhibit II.  A transcript of that interview is

attached as Exhibit JJ.

2.  Disorderly Conduct is a class C misdemeanor, the least severe misdemeanor possible.

3.  When Stearns was released from the Cowley County Jail, he was given a date to appear in the District Court for the 19th Judicial District of Kansas.

4.  Around 4:00 p.m. the next day, March 24, 2007, the Office of the Cowley County Attorney filed a complaint in the District Court for the 19th Judicial District of Kansas charging Stearns with one count of Disorderly Conduct.  (Ex. LL)

5.  The case was eventually set for trial, scheduled to begin on July 27, 2006.  The morning of trial, the Office of the Cowley County Attorney moved to dismiss the complaint against Stearns. The court granted the motion and dismissed the complaint.  (Journal Entry of Dismissal, Ex. MM.)

### D.  Response to Defendants' Summary Judgment Argument

Below is a summary of the defendants' argument by section.  For each section, the plaintiff has responded and listed the discovery needed.

**Section 1.**  Concerning Daniel Stearns' claim that Floyd Clarkson and other officers arrested him without probable cause in violation of the Fourth Amendment, Clarkson claims qualified immunity.  Qualified immunity has two parts.  It exists unless (1) the defendant's conduct violated a constitutional right, and (2) the constitutional right violated was clearly established at the time. *Anaya v. Crossroads Managed Care Systems, Inc.*, 195 F.3d 584, 593 (10th Cir. 1999).  Clarkson has not claimed under the second part of the qualified immunity test that it was hazy at the time of Stearns' arrest whether arresting someone without probable cause or a warrant violated the Fourth Amendment.  Instead, Clarkson claims he had probable cause and is entitled to qualified immunity under the first part of the test because he did not violate the Fourth Amendment at all.

RESPONSE: There was no probable cause to arrest Stearns.  Probable cause is more than

bare suspicion.  Probable cause to arrest exists where the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to cause a man of reasonable caution to believe that an offense has been or is being committed.  *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed.2d 1879 (1949).  Clarkson had no cause to believe Stearns had committed any crime.

Clarkson does not state in his report that he arrested Stearns based on probable cause.  He says he arrested Stearns on Christopher Smith's order "for Disorderly [Conduct] from the case at 322's (Officer Venable) house last night." (Ex. EE.)  Nothing that occurred at Venable's house gave Smith, Clarkson, or anyone else probable cause to arrest Stearns for disorderly conduct.  Donna Venable reported to her husband that someone was "knocking on the door and ringing the doorbell." (Report of Greg Venable, Ex. CC.)  The defendants admit that Donna Venable never answered the door and Stearns and Donna Venable never spoke to each other.  When Donna Venable finally got to the door, Stearns was already leaving.  (Answer at 4.)  No reasonable officer could conclude that just knocking on a door and ringing a doorbell equals disorderly conduct.

Clarkson now claims he also arrested Stearns for disorderly conduct based in part on Stearns use of profanity when speaking to police officers.  However, using profanity when speaking to police also cannot equal disorderly conduct.  On its face, the Kansas statute on disorderly conduct does prohibit "offensive, obscene, or abusive language."  K.S.A. § 21-4101 (1995).  However, more than 25 years ago, the Kansas Supreme Court held the state prohibition on disorderly conduct only outlaws "fighting words" as that term has been defined by the United States Supreme Court.  *State v. Huffman*, 228 Kan. 186 (1980).  Fighting words are "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L. Ed. 2d 284

(1971).  One after another, federal courts of appeal have held that "swear words, spoken to a police

officer, do not provide probable cause for an arrest for disorderly conduct because the words, as a

matter of law, are not 'fighting words.'"  *Johnson v. Campbell*, 332 F.3d 199, 213 (3d Cir. 2003)

("Johnson's words were unpleasant, insulting, and possibly unwise, but . . . [a]s Johnson's words

were not 'fighting words,' Campbell had no probable cause to arrest him for disorderly conduct");

*Buffkins v. City of Omaha*, 922 F.2d 465 (8th Cir. 1990) (holding officer had no probable cause to

arrest person for disorderly conduct based on statement, "I will have a nice day, asshole"); *Duran*

*v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1989) (holding officer wrongfully arrested for disorderly

conduct person who "began yelling profanities in Spanish and continued to make obscene gestures"

because "disgraceful as Duran's behavior may have been, it was not illegal; criticism of the police

is not a crime").

    Clarkson claims he arrested Stearns in part based on Ryan Walker's report and Blake Porter's

911 call, but even the limited record available at this stage shows these claims are false.  Walker did

not write his report until days after Stearns was arrested, (Report of Chad Gordon, Ex. AA), and

Clarkson's report shows he did not know Porter's 911 call even existed at the time he arrested

Stearns.  (Ex. EE.)  Chad Gordon's report shows that hardly anyone at the police department knew

(or cared) about the call at the time Stearns was arrested.[1]  (Ex. AA.)  Clarkson claims he wrote his

report within a day of the arrest, but his reference to Walker's report shows that is not true.  The

record shows an effort by the Winfield Police Department to justify Stearns' arrest after the fact and

shows that Clarkson was part of that effort.

---

    [1]  Even if Clarkson had known about Blake Porter's 911 call at the time he arrested Stearns,
it would have done little to bolster Clarkson's claim that there existed probable cause to arrest
Stearns for disorderly conduct.  Someone saying he is going to "get back" at someone else is hardly
a threat of physical violence and certainly is not illegal.  There are plenty of non-violent legal ways
to get back at someone, taking legal action for instance.

Finally, Clarkson claims he arrested Stearns based in part on Tom Campbell's statement to Clarkson that "a man meeting the description of Stearns" was loitering around Campbell's patrol car. Clarkson's report shows Campbell said no such thing. It is clear from Clarkson's report that he and Campbell had no idea who had been hanging around Campbell's patrol car. (Ex. EE.)

DISCOVERY NEEDED: Depositions of Floyd Clarkson, Tom Campbell, Greg Venable, Donna Venable, Jerry DeVore, and Chad Gordon; Answers to Interrogatories Served on Floyd Clarkson, Tom Campbell, and Jerry DeVore; Production pursuant to Requests Served on Floyd Clarkson, Tom Campbell, and Jerry DeVore.

**Section 2.** Count 2 of the Complaint alleges that strip searching Stearns was objectively unreasonable, therefore violated the Fourth Amendment, because officers had no probable cause or reasonable suspicion to believe he had a weapon or drugs, and because he was strip searched by two to three officers while several others watched for no purpose but to degrade and humiliate him. Clarkson was not initially named in Count 2 as one of the officers involved in the strip search and has not been named as yet because he denied in his answer being present for the strip search. (Answer at 3.) However, now that Clarkson remembers being at the strip search (after seeing a video of himself there), the plaintiff will amend its complaint to add Clarkson as one of the defendants in Count 2.

Clarkson again claims qualified immunity. And again, he does not argue that the constitutional right at issue was unclear at the time. He claims that he did not violate the Fourth Amendment at all because his involvement in the strip search was objectively reasonable. He argues his involvement was objectively reasonable because (1) he had limited involvement in the strip search, and (2) there was a "concern that Stearns could be concealing a weapon." (Defendants' Memorandum at 12, 19.)

RESPONSE: The extent of Clarkson's participation in the strip search is of no consequence except maybe as to punitive damages.  The video of the strip search shows Clarkson there from beginning to end.  Whether he participated a little bit or a great deal, he is liable if there was no legitimate reason under the Fourth Amendment for the search or the manner in which it was conducted.

However, assuming Clarkson's level of participation is somehow relevant, it looks like Clarkson is not being honest about his memory of the strip search.  He first denied being at the strip search and left any mention of it out of his report in violation of § 3.31 of the Winfield Police Department Rules and Regulations .  Then, he admitted attending the strip search after seeing a video showing him as one of the first officers in the holding cell before the strip search and one of the last to leave after it was over.  Now, Clarkson claims he did not know he was going to participate in a strip search but does remember Campbell specifically asking him to participate in something for reasons of officer safety.  Clarkson now claims he does not remember if he touched Stearns during the strip search.

The video does not show Clarkson's level of participation in the strip search.  Without deposing Clarkson and the other officers who participated, there is no way for the plaintiff to know what Clarkson actually did or did not do.

Clarkson's claim there was a "concern that Stearns could be concealing a weapon" is contradicted by the record.  Clarkson and Campbell were so comfortable in their belief Stearns did not have a weapon, they did not even search his pockets at the scene of the arrest in violation of § 3.26 of the Winfield Police Department Rules and Regulations.  There could be no legitimate concern that Stearns was concealing a weapon.  He had not ever been seen with a weapon.  He had cooperated with all the officers he had come into contact with including the officers who had arrested

him that night.  He had never even reportedly raised his voice to any of the officers.

Further, the Fourth Amendment does not allow strip searches just to alleviate a "concern." It requires at least reasonable suspicion if not probable cause that a weapon exists.  *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Williams v. Kaufman County*, 352 F.3d 994 (5th Cir. 2003); *Skurstenis v. Jones*, 236 F.3d 678 (11th Cir. 2000); *Swain v. Spinney*, 117 F.3d 1 (1997).  There was no such probable cause or even reasonable suspicion in this case.

Clarkson has no excuse for the manner in which the strip search was conducted.  He offers no explanation why seven different officers were involved.  The reasonableness of a strip search under the Fourth Amendment turns on the scope of the intrusion, the justification for initiating it, the place it is conducted, and the *manner* in which it is conducted.  *Bell*, 441 U.S. 520.

DISCOVERY NEEDED: Depositions of Floyd Clarkson, Tom Campbell, Jeff Elston, Randy Topper, Gary Tucker, Steve Bumpus, and Roger Dobbs; Answers to Interrogatories Served on Jerry DeVore, Floyd Clarkson, Tom Campbell, Jeff Elston, Randy Topper, and Gary Tucker; Production pursuant to Requests Served on Jerry DeVore, Floyd Clarkson, Tom Campbell, Jeff Elston, Randy Topper, and Gary Tucker.

**Section 3.**  Count 3 of the Complaint alleges that the City of Winfield and Jerry DeVore are liable under § 1983 for (1) failing to train or instruct Clarkson how to effect an arrest or conduct a strip search without violating the Fourth Amendment and (2) failing to issue policies and procedures that dictated how to effect and arrest or conduct a strip search without violating the Fourth Amendment.  The defendants argue that Count 3 should be dismissed because the plaintiff cannot point to "a direct causal link" between "any policy (or lack of policy) or training (or lack of training) at the WPD."  (Defendants' Memorandum at 21.)

The defendants are correct in that the plaintiff cannot point to a policy of the Winfield Police

Department or lack thereof that caused the unconstitutional strip search in this case.  However, the reason the plaintiff cannot do so is the defendants have refused to participate in discovery.  The plaintiff has served on both Jerry DeVore and Floyd Clarkson interrogatories and requests for production asking for information on (1) the policies and procedures of the Winfield Police Department regarding when and how to conduct an arrest and strip search, and (2) Clarkson's training on when and how to conduct an arrest and strip search.  The defendants have refused to answer that discovery.  The defendants did turn over some policies in their initial disclosures, but the plaintiff has no way of knowing what is missing.

Even at this early stage, however, the plaintiff can point to a practice of the Winfield Police Department that directly caused the unconstitutional arrest in this case.  In ¶¶ 40 and 46 of the defendants' statement of facts, DeVore and Clarkson both claim "the WPD had a regular practice of carrying out arrests based upon oral communications from the Cowley County Attorney, without the Cowley County Attorney delivering paper warrants to the WPD."  This looks to have been the practice even though § 3.24 of the Winfield Police Department Rules and Regulations states:

> Whenever possible, a warrant will be obtained prior to making an arrest. When a valid warrant is placed in the hands of an officer for execution, it is his/her duty to carry out its demands without delay.

(Ex. FF.)  This practice caused Clarkson to arrest Stearns on the county attorney's order without anyone at the police department ever wondering if the county attorney had sought a warrant.  It directly caused the arrest of Stearns without a warrant and without probable cause in violation of the Fourth Amendment.

DISCOVERY NEEDED: Depositions of Floyd Clarkson and Jerry DeVore; Answers to Interrogatories Served on Floyd Clarkson and Jerry DeVore; Production pursuant to Requests Served on Floyd Clarkson and Jerry DeVore.

**Sections 4, 5, and 6.**  Counts 5, 6, and 7 of the Complaint allege Clarkson and others committed false arrest and imprisonment, assault, and battery when he and other officers (some of them carrying assault rifles) arrested Stearns without any legal authority; no legal authority because they had no warrant, no probable cause, and the arrest was prohibited by K.S.A. § 22-2401 (Supp. 2006).  That statute limits when an officer may arrest without a warrant.  It allows an officer to arrest a person without a warrant if the officer has probable cause to believe the person had committed a misdemeanor and has probable cause to believe the person will injure himself or others or damage property unless immediately arrested.  Clarkson argues he could not have committed false arrest, assault, or battery because he had legal authority to arrest Stearns.  Clarkson argues he had legal authority because he had probable cause to believe Stearns had committed a misdemeanor and had probable cause to believe Stearns would injure himself or others or damage property unless he was immediately arrested.  Clarkson also argues that the discretionary function exception to the Kansas Tort Claims Act exempts him from liability.  Finally, Clarkson argues he could not have committed assault because he never drew his weapon.

RESPONSE: In the response to § 1, the plaintiff has already addressed Clarkson's claim that he had probable cause to arrest for disorderly conduct.  In response to ¶ 55 of the defendants' statement of facts, the plaintiff has also addressed Clarkson's claim that he had probable cause to believe Stearns would injure himself or others or damage property.  The discretionary function exception to the Kansas Tort Claims Act does not exempt Clarkson from liability because it does not apply.  Officers have discretion to arrest or not *if* they have probable cause or a warrant and if they are not violating § 22-2401.  The defendants have cited no case to support their claim that an officer may arrest without a warrant or probable cause or in violation of state statute with impunity.  In the only case cited by the defendants, *Soto v. City of Bonner Springs*, the Kansas Court of Appeals

simply held an officer cannot be liable for false arrest if he arrested the plaintiff on a facially valid warrant. 166 P.3d 1056 (2007). *Mendoza v. Reno County* was a false arrest action against police officers. 235 Kan. 692 (Kan. 1984). The Kansas Supreme Court held the discretionary function exception applied *because the officers had probable cause to arrest*. *Id*. at 694. The court went on to state, "The legal status of a warrantless arrest without probable cause is outside the issues of this case." *Id*.

Clarkson cannot escape liability for assault just because he personally did not draw his weapon. Clarkson is just as liable as those who did brandish assault rifles if he aided and abetted. The Kansas Supreme Court has listed the elements of aiding and abetting a tort:

> (1) The party whom the defendant aids must perform a wrongful act causing injury; (2) at the time the defendant provides assistance, he or she must be generally aware of his or her role in part of an overall tortious or illegal activity; and (3) the defendant must knowingly and substantially assist in the principal violation

*York v. InTrust Bank, N.A.*, 265 Kan. 271, 297-98 (1998). Clarkson's actions meet the all the elements of aiding and abetting assault.

DISCOVERY NEEDED: Please see the plaintiff's response to § 1.

**Sections 7 and 8.** Count 8 of the Complaint alleges that the officers who strip searched Stearns violated K.S.A. § 22-2521 (1995). That section prohibits a strip search if a person is arrested for a nonviolent misdemeanor and there is no probable cause to believe he is concealing a weapon or controlled substance. It also states that all strip searches "shall be conducted so that the search cannot be observed by any person other than the persons conducting the search." Another statute, K.S.A. § 22-2523 (1995), creates a private right of action for violation of § 22-2521. Count 9 of the Complaint alleges that officers committed battery by strip searching Stearns without any legal authority to do so. Clarkson argues he cannot be liable for any violation of § 22-2521 or any battery

because (1) he was only present at the strip search "as a bystander,"  (Defendants' Memorandum at 26), and (2) the discretionary function exception of the Kansas Tort Claims Act exempts him from liability.

RESPONSE: Clarkson was more than a bystander.  In ¶¶ 74, 75, and 77 of the defendants statement of facts, he admits he escorted Stearns to the holding cell where the strip search was conducted and was asked by Tom Campbell to participate for reasons of officer safety.  The video of the strip search shows Clarkson as one of the first in the holding cell and one of the last out after the strip search is over.  Again, Clarkson is just as liable as the principles if he aided and abetted the strip search.

As the plaintiff has pointed out, Clarkson memory is selective when it comes to the strip search.  He now claims he remembers the strip search but does not recall how involved he was.  The video of the strip search does not show Clarkson's participation.  The only way to discover what Clarkson did at the strip search is to take his deposition and the depositions of the other officers present.

The discretionary function exception does not apply.  The defendants cite *Allen v. Wyandotte County*, 773 F.Supp. 1442 (D. Kan. 1991).  *Allen* was a § 1983 action and an action for battery.  The plaintiff alleged that officers strip searched her in violation of the Fourth Amendment and thereby battered her.  The court held the officers strip searched the plaintiff in violation of the Fourth Amendment, but did not violate K.S.A. § 22-2521.  Because the officers did not violate § 22-2551, the discretionary function exception applied and the court threw out the plaintiff's battery claim.  The court in *Allen* never held that officers have discretion to violate § 22-2551.  In the case at hand, the record shows officers did violate state statute by strip searching Stearns.  Therefore, the discretionary function exception does not apply.

DISCOVERY NEEDED: Please see the plaintiffs response to § 2.

**Section 9.**   Count 11 of the Complaint makes out a *respondeat superior* claim against the City of Winfield under the Kansas Tort Claims Act.  Like Clarkson, the City of Winfield argues the Act's discretionary function exception applies and it is exempt from liability.

RESPONSE:   The City of Winfield is not exempt from liability under the Kansas Tort Claims Act for the same reasons Clarkson is not exempt.

DISCOVERY NEEDED: Please see the plaintiff's response to §§ 1 and 2.

**Section 10.**   The defendants have moved the Court to "decline to exercise jurisdiction" over the state law claims in this case in the event the Court grants the defendants summary judgment just on the plaintiff's § 1983 claims.  (Defendants Memorandum at 28.)  The defendants have overlooked the plaintiff's claim of diversity jurisdiction pursuant to 28 U.S.C. § 1332.

DISCOVERY NEEDED: None.

I swear the foregoing is true and correct.

Christopher M. McHugh

*Attorney for the Plaintiff*

Signed and sworn before me on November 14, 2007.

NATALIE MOYER
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp. 6-26-10

30