IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DANIEL N. STEARNS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 07-1145-MLB |
| | ) |
| THE BOARD OF COUNTY COMMISSIONERS | ) |
| OF THE COUNTY OF COWLEY, KANSAS; | ) |
| CHRISTOPHER SMITH, County Attorney for | ) |
| Cowley County; BOB G. O'DELL, Sheriff of | ) |
| Cowley County; TOM CAMPBELL, JEFF | ) |
| ELSTON, DOUG ALLISON and STEVEN | ) |
| DEILL, Cowley County Sheriff Deputies; | ) |
| STEVE BUMPAS and ROGER DOBBS, Cowley | ) |
| County Sheriff Corrections Officers; THE CITY | ) |
| OF WINFIELD, KANSAS; JERRY DEVORE, | ) |
| Chief of the Winfield Police Department; and | ) |
| FLOYD E. CLARKSON, Winfield Police | ) |
| Department Patrolman, | ) |
| | ) |
| Defendants. | ) |

**CITY OF WINFIELD DEFENDANTS'
SUPPLEMENTAL MEMORANDUM IN SUPPORT
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

This action was commenced on May 23, 2007. The Complaint asserted 12 federal and state

claims, including a claim under 42 U.S.C. § 1983, arising out of the plaintiff's arrest by the Winfield

Police Department (WPD) and subsequent strip search by the Cowley County Sheriff's Department.[1]

Defendant Clarkson is the Winfield officer who arrested plaintiff. Clarkson, along with the City of

Winfield and Winfield Police Chief Jerry Devore, are sometimes referred to herein as the "Winfield

Defendants."

---

[1] Plaintiff amended his Complaint on June 2, 2008, adding some defendants and dropping
others (Doc. 89). The nature of his claims, however, remains the same.

On October 15, 2007, the Winfield Defendants filed a motion for summary judgment on the basis of qualified immunity. (Docs. 38 and 39).  Plaintiff responded with a 30-page Rule 56(f) affidavit (Doc. 52) in which their counsel claimed that additional discovery was necessary before defendants' motion could be addressed.  The affidavit identified which paragraph of defendants' statement of uncontroverted facts were disputed and/or what discovery was needed to determine if an advanced fact was true.  Plaintiff also set forth five "Additional Facts" (Doc. 52, p. 19).  The Winfield Defendants responded to plaintiff's affidavit arguing that discovery was not warranted and that the Court could grant the defendants' summary judgment motion on the record presented. (Doc. 61).

Thereafter, the Court entered an order allowing limited discovery on the issue of qualified immunity and establishing a schedule allowing the parties to supplement their earlier summary judgment pleadings following discovery. (Doc. 63).

Since those orders were entered, plaintiff has taken the depositions of 12 individuals including officers from the Winfield Police Department and Cowley County Sheriff's Department and the Cowley County Attorney.  Defendants have taken plaintiff's deposition. The Winfield Defendants submit that this discovery has not changed the material uncontroverted facts and that summary judgment based on qualified immunity is now appropriate.

## THE UNCONTROVERTED FACTS

In their summary judgment memorandum, defendants set forth 89 paragraphs of facts which they contended were uncontroverted as required by D. KAN. R. 56.1(a).  Obviously, not all of those facts were essential to the qualified immunity issue presented by the motion and a number were intended simply to provide the Court with a complete picture of the events leading up to and following the plaintiff's arrest.  Not surprisingly, in his previous efforts to persuade the Court that

discovery was required, plaintiff attempted to create numerous factual disputes, regardless of whether those disputes have any direct bearing on the question of qualified immunity. It is anticipated that plaintiff will do the same in an attempt to avoid summary judgment. In this regard, the Court's directive in *Powers v. Tweco Products*, 206 F. Supp. 2d 1097, 1102 (D. Kan. 2002), is particularly pertinent:

> The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment because the factual dispute must be material. (citation omitted) "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." (citation omitted).

In light of the discovery that has now taken place, it is appropriate for the Winfield Defendants to address those facts that were disputed by plaintiff and for which plaintiff contended discovery was necessary. Defendants will not, however, address many of the disputed facts which are not material to the issue of qualified immunity and which served only as background.[2]

1.      Defendants submit the precise time of plaintiff's time in the Jail is not material to the Court's determination of summary judgment.

10.     In his Amended Complaint, plaintiff has omitted "John Doe" and "Richard Doe" and added Bumpas and Dobbs. Thus, the only remaining defendants from the WPD are DeVore and Clarkson.

---

[2] So that multiple pleadings would not have to consulted, defendants had originally intended to set forth verbatim the facts controverted by plaintiff along with his response, followed by defendants' reply. Doing so, however, would have caused this memorandum to significantly exceed the 30-page limit for Rule 56 motions contained in the Court's Revised Standing Order, which defendants assume applies to this supplemental memorandum as well.

11.     The shooting of Danny Fruits is the subject of a case brought against the officers involved in the shooting.  That case *(Hilda M. Sumner, et al. vs. The City of Winfield, Kansas, et al.,* Case No. 07-1187-JTM) is currently pending before Judge Marten.  Defendants submit the specific facts in that case are not material to the Court's determination in this matter beyond the uncontroverted facts that (1) Fruits was shot and killed by officers of the WPD on March 8, 2006; and (2) Stearns is Fruits' son.  These material facts are uncontroverted. (Doc. 39, Exhibit A, ¶ 8).

13.     Officer Clarkson participated in the later arrest of Daniel Stearns.  Officer Clarkson testified in his deposition that at the time of Mr. Stearns' arrest on March 23, 2006 (before Chad Gordon began his investigation), Clarkson was aware of the incident in the bar from his shift supervisor.  Clarkson said such information is given from shift to shift, especially if it deals with officer safety.  He testified that he understood Danny Fruits' son (Stearns) had been at a bar and made statements to the effect that he would get even with the police for the death of his father. (Deposition of Floyd Clarkson, pp. 23-24 [cited excerpts from the deposition of Officer Clarkson are attached hereto as Exhibit A]).

Although Stearns has denied being at O'Kelly's Bar and has denied making the statements, (Deposition of Daniel Stearns, pp. 40-41 [cited excerpts from the deposition of Stearns are attached hereto as Exhibit B]), it remains uncontroverted that Officer Clarkson was made aware of an incident at O'Kelly's Bar as described above and that he believed Stearns made the threatening comments.  Officer Clarkson testified that the incident at O'Kelly's Bar was one of the matters he took into consideration when he arrested Stearns on March 23 because it was relevant to his determination that Stearns may cause harm to himself or others unless arrested. (Doc. 39, Exhibit A, ¶¶ 8, 16; Clarkson Depo., p. 23).

-4-

Defendants further submit that Stearns' denial of the incident at O'Kelly's Bar is not material as it relates to his arrest, as it is the knowledge and good faith belief of the officer at the time that is relevant in a determination of the lawfulness of an arrest.

14.   Defendants submit the facts as later found about the incident at O'Kelly's Bar are not material to a determination of Officer Clarkson's good faith belief when he arrested Stearns.

17.   Stearns denies that he told Officer Walker he was in town because the police had killed his father. (Stearns Depo., p. 39).  However, Officer Walker reported that Stearns was rude and that Stearns said he was in town because "we killed his fucking dad." (Doc. 39, Exhibit C, ¶ 5). The material fact is that Officer Walker's account of the events was provided to Officer Clarkson. (Doc. 39, Exhibit A, ¶ 8).  Officer Clarkson considered this information along with other information when he determined he had probable cause to arrest Stearns for disorderly conduct and that he should be immediately arrested or could cause harm to himself or others. (Doc. 39, Exhibit A, ¶ 8).

Defendants submit that Officer Clarkson's good faith belief that Stearns made these comments to Officer Walker is the proper inquiry, as it is the facts and knowledge possessed by an arresting officer that are the key inquiry into the propriety of an arrest.   That is true even if facts known and believed by an officer at the time of an arrest are later shown to be incorrect.

19.   Defendants submit it is not material whether Stearns was "pounding" on the door of the Venable residence or whether he was ringing the doorbell.

In his deposition, Stearns admitted he was on the front porch of the Venable residence at 12:30 or 1:00 a.m. on March 23. (Stearns Depo., pp. 22, 23, 25).  He admitted he rang the doorbell of the Venable residence at this late hour. (Stearns depo., p. 22).  He admitted no lights were on in the house at the time. (Stearns Depo., p. 143).  He admitted he was on the porch ringing the bell for about half a minute. (Stearns Depo., p. 148).

Stearns further admitted that, following this, he drove to a nearby residence, rang their doorbell, then came back to his gold-colored car. When he did so, he saw a police car at the Venable residence. The patrol car drove past the gold car occupied by Stearns and a female. The female pushed Stearns' head down and lowered her head out of sight so the officer would not see them. (Stearns Depo., pp. 151-153).

The material fact is that Stearns went onto the porch of the house of a police officer late at night and attempted to arouse the occupants at the door. This action frightened the officer's wife. These facts remain uncontroverted.

20.     Although Officer Venable did not put in his report the fact that his wife told him she heard the person on the porch say, "later," he testified to this fact in his deposition. (Deposition of Greg Venable, p. 13 [cited excerpts from Officer Venable's deposition are attached hereto as Exhibit C]). This fact has not been controverted.

21.     Given the fact Stearns has admitted he was on the Venable porch, admitted he rang the doorbell and admitted he drove his car away, whether or not Officer Venable included his wife's description of the tail lights in his report—or what the tail lights actually look like—is not material. *See also* Defendants' Reply to ¶ 19, *supra*.

22.     Officer Venable has been deposed. His report, like many such reports, does not include every detail of the incident. Officer Venable testified that when his wife called him after the incident on the porch that she had a shaky voice and was very scared. He testified his wife was upset and crying. (Venable Depo., p. 11). He also testified his wife did not want him to go back on duty but to stay with her at the house. (Venable Depo., p. 13). He testified he "went through two phone batteries that night with my wife." (Venable Depo., p. 51).

Defendants submit the fact has not been controverted.

28.     When he was deposed, Officer Venable did not say he noticed the red and white jersey while the man was driving the car, so plaintiff may be correct on this irrelevant point.  Since Stearns admitted he was driving the car noticed by Officer Venable (Stearns Depo., p. 32), the point at which Officer Venable noticed the red and white jersey is not material.

31.     While certain portions of Officer Venable's contact with Stearns at 3:38 a.m. were unoffensive, many earlier comments and actions had not been so cordial.  Officer Venable testified that when he got out of his patrol car, Stearns was standing in the street near the patrol car and that Stearns said, "you're probably the motherfucker that shot my dad."  Officer Venable said Stearns said this very loudly.  He said Stearns was pointing at him with his finger. (Venable Depo., pp. 23-24).  Venable said he got within three feet of Stearns and observed that Stearns was loud and "antsy."  He said Stearns was rocking back and forth on his feet.  Officer Venable testified that Stearns' actions made him very nervous and he watched Stearns' hand movements.  He detected a strong odor of alcohol on Stearns.  (Venable Depo., p. 26).

In his deposition, Stearns admitted he had been drinking and would likely have had an odor of alcohol about him. (Stearns Depo., pp. 115, 162, 165).  He also admitted he told Venable he was probably the "motherfucker that shot my dad." (Stearns Depo., p. 164).  Further, Stearns admitted he told Venable that "one of you motherfuckers did it, maybe Dougherty or Knoles." (Stearns Depo., p. 165).  Stearns said when he said these things to Venable that he was not angry but that he was "scared." (Stearns Depo., p. 165).  Regardless, it remains uncontroverted that Stearns made profane and abusive statements to Officer Venable.

32.     Plaintiff does not provide any factual support for his narrative about Stearns' travels throughout Winfield.  Moreover, in light of the discovery that has now been undertaken, it is clear that these facts are uncontroverted.

Stearns was questioned in his deposition about Venable asking him whether he had been on east 13th (Venable's house) earlier in the night.  Stearns admitted he told Venable it was none of his "fucking business."  He admitted he told Venable "don't you worry about where I've been."  He admitted accusing Venable of being the "motherfucker who shot my dad." (Stearns depo., pp. 164-65)

Significantly, Officer Venable testified that Stearns' conduct in the street was such that Venable had probable cause to arrest him for disorderly conduct but that he exercised his discretion to not do so at that time. (Venable Depo., p. 38).

35.     (Plaintiff mistakenly identified this as uncontroverted fact 36).  Plaintiff does not controvert this fact and his response confirms that Officer Clarkson acted under the belief that the County Attorney had ordered Stearns arrested.

38. and 39.     The depositions requested by plaintiff have been taken, including the deposition of Cowley County Attorney Christopher Smith.  Based on the depositions, the following is a more precise recitation of the facts regarding the County Attorney's and Chief's roles in the arrest:

a.     Christopher Smith testified that Lt. Kurt Weber with the WPD came to his office early in the morning of 3-23-06.  He said Lt. Weber told him about the incident at Officer Venable's house and the incident between Venable and Stearns later that night/early morning.  Smith said that after Lt. Weber told him the facts, Smith told Lt. Weber that Smith believed the WPD had probable cause to arrest Stearns for disorderly conduct. (Deposition of Christopher Smith, pp. 4-6, 8, 13, 17 [cited excerpts from the deposition of Christopher Smith are attached hereto as Exhibit D]).  Smith said he did not direct the arrest of Stearns because the WPD, rather than the County Attorney, has that authority. (Smith Depo., p. 18).

-8-

b.      Chief DeVore was made aware that Lt. Weber had spoken with Chris Smith.  Chief DeVore telephoned Smith and again recounted the facts of the incident at Officer Venable's house and the incident in the street between Stearns and Venable.  In the conversation, Chief DeVore said Smith informed him that Smith believed there was probable cause to arrest Stearns for disorderly conduct and that Stearns should be arrested before something else happened.  Smith was to do the paperwork and file the Complaint.  (Deposition of Jerry DeVore Depo., pp. 11-13, 17-18 [cited excerpts from the deposition of Chief Devore are attached hereto as Exhibit E]).  Smith testified that Chief DeVore was justified in saying that the County Attorney was going to file a case against Stearns. (Smith Depo., p. 50).

c.      Based upon his conversation with Smith, Chief DeVore directed that Stearns be arrested for disorderly conduct. (DeVore Depo., p. 14).

d.      On the following day, March 24, 2006, the Cowley County Attorney filed a Complaint/Information against Stearns alleging he committed the crime of disorderly conduct on March 23, 2006. (Smith Depo., p. 35, Deposition Exhibit 17 [attached hereto as Exhibit F]).  No warrant was issued or requested because Stearns had been arrested and booked the preceding day. (Smith Depo., pp. 31, 34).

This deposition testimony either confirms the controverted facts as originally stated or clarifies the facts in such a way as to reinforce the Winfield Defendants' legal arguments.

40.-42.      As is true in a number of instances, plaintiff's response does not "fairly meet the substance of the matter asserted." *See* D. Kan. R. 56.1(e).  Moreover, the depositions taken in this case have not controverted these facts.

43.      Plaintiff does not provide evidence to controvert this fact.  Discovery has been allowed and Chief DeVore testified consistently with this uncontroverted fact. (DeVore Depo., p.

25).

45.     This uncontroverted fact, confirmed through discovery, establishes that Officer Clarkson arrested Stearns with a good faith belief as to probable cause.

46.     In his deposition Officer Clarkson testified about his understanding of this procedure. (Clarkson Depo., p. 63).  Chief DeVore testified consistently with this understanding.  (DeVore Depo., pp.22-23).  Defendants submit this fact remains uncontroverted.

48.     The proffered fact deals with Officer Clarkson and defendants will stay on that issue rather than pursue plaintiff's tangent.  As noted earlier, the facts as known by Officer Clarkson at the time of the arrest of Stearns, not whether those facts later turned out to be incorrect, are the proper focus for the Court.

Officer Clarkson testified in his deposition that was made aware of 911 call from O'Kelly's Bar and of Stearns' comments to Officer Walker during the normal course of events at shift change. It is common for supervisors to inform the new shift of events from the preceding shift.  Officer Clarkson said that is especially true if matters dealing with officer safety have occurred during the preceding shift.  (Clarkson Depo., pp. 23-24).  Officer Clarkson testified he read Officer Venable's report on email at the office. (Clarkson Depo., p. 31).

Defendants submit the fact remains uncontroverted.

50.     While defendants included this matter in their uncontroverted facts, it is collateral to the material facts related to Stearns' arrest.  Officer Clarkson did not testify that the incident related by Campbell formed the basis for his conclusion that Stearns should be immediately arrested. Clarkson wrote in his affidavit and testified that his independent probable cause to arrest were based on his understanding of the incidents at Venable's house and between Venable and Stearns later (Clarkson Depo., pp. 10-14) and his belief that Stearns should be immediately arrested came from

information relating to the Venable incidents and the information about the 911 call from O'Kelly's Bar and the traffic stop by Officer Walker. (Clarkson Depo., pp. 23-24).

53.     Plaintiff has previously admitted that Officer Clarkson effected the arrest of Stearns while operating under the belief that the Cowley County Attorney had made a determination of probable cause. (*See* Plaintiff's Responses to ¶¶ 35 and 45). Now, without any factual basis, plaintiff attempts to argue that that belief was unjustified. Plaintiff's response does not controvert this fact. Officer Clarkson testified he learned from his superiors that the Cowley County Attorney had determined Stearns should be arrested. Officer Clarkson carried out the arrest at the direction of his superiors in the WPD. (Clarkson Depo., p. 47). Officer Clarkson saw a text page from his superior, Lt. Weber, to arrest Stearns. The page indicated Weber had spoken with the county attorney and that Stearns was to be arrested. (Clarkson Depo., p. 28).

Defendants submit the material fact is that Officer Clarkson arrested Stearns at the direction of his superior. He also had independent probable cause to arrest as shown below.

54.     Plaintiff's response does not controvert this fact. Officer Clarkson testified he had independent probable cause to arrest Stearns based on his review of Officer Venable's report of the incidents at the Venable house and the incident between Venable and Stearns. (Clarkson Depo., pp 10-11, 14, 23). This fact remains uncontroverted.

56.     (Plaintiff mistakenly identified this as Fact 55). Plaintiff does not controvert the facts as stated by Officer Clarkson. Plaintiff offers argument that Clarkson did not have the belief he stated. Plaintiff was given the opportunity to depose Officer Clarkson and Officer Clarkson testified about the matters that led to his belief that Stearns should be immediately arrested because he could cause harm to himself or others. The facts he relied on were (1) the 911 call from O'Kelly's bar; (2) the incident with Officer Walker and (3) the incidents at Venable's house and between Stearns and

Officer Venable. (Clarkson Depo., pp. 10-11, 16-19, 23).  The facts as stated remain uncontroverted in spite of plaintiff's argumentative response.

59.    The only WPD officer at the arrest scene was Officer Clarkson.  The others present were deputies with the Cowley County Sheriff's Office. (Deposition of Jeff Elston, p. 9 [cited excerpts from the deposition of Jeff Elston are attached hereto as Exhibit G]).  Clarkson had no authority over nor control over the actions of the Cowley County Sheriff's Officers who were present at the arrest.

Officer Clarkson was deposed and testified he kept his weapon holstered. (Clarkson Depo., p. 39).  This fact therefore remains uncontroverted.

61.    This is not a controversion of fact and the fact as stated remains uncontroverted.

68.    Plaintiff does not controvert this fact and, given plaintiff's admission that he is not claiming unreasonable force in the placement of the handcuffs, defendants submit this fact is not material to the Court's decision as to qualified immunity.

69.    Defendants concede that plaintiff has successfully controverted the color of the vehicle in the driveway.

72.    As is his pattern, plaintiff makes numerous factual contentions  with no evidentiary support.

Deputy Campbell has testified that as he transported Stearns to the jail he heard Stearns make a number of comments, including that Stearns was going to get things "straightened out."  Deputy Campbell asked what Stearns meant by that and Stearns replied, "I'm going to take care of business." Deputy Campbell interpreted the comment as a threat. (Deposition of Tom Campbell Depo., pp. 30-31 [cited excerpts from the deposition of Deputy Campbell are attached hereto as Exhibit H).

-12-

Deputy Campbell also testified that Stearns said the police had been "jacking" with him. (Campbell Depo., p. 29).

Stearns admitted in his deposition that he told Campbell that, "I take care of business." Stearns said his comment was not meant to be a threat. (Stearns depo., pp. 59-60). He also testified that he told Campbell that the police were "jacking with him." (Stearns Depo., p. 177).

Defendants submit the material fact is that on the way to the jail, Stearns said he would "take care of business." It is uncontroverted that Deputy Campbell took that comment as a threat, whether or not Stearns meant it as a threat.

75.     Defendants submit plaintiff has not effectively controverted Officer Clarkson's affidavit as to the reasons he went into holding cell, and that Clarkson's deposition testimony confirms his affidavit. (Clarkson Depo., p. 56). He testified he was in the cell because he was requested to be there by Deputy Campbell. (Clarkson Depo., p. 56, 57). Officer Clarkson testified he was not aware that a strip search had been conducted on Stearns; he believed Stearns had simply changed into jail clothes. It was for that reason he did not include in his report that a strip search had occurred. (Clarkson Depo., p. 102). Officer Clarkson did not realize he had witnessed a strip search until he reviewed the jail video after his report had been written. (Doc. 39, Exhibit A, ¶43).

76.     Plaintiff's response does not controvert the stated fact.

77.     Plaintiff's response does not controvert the stated fact.

78.     Defendants agree Stearns was ordered by a Cowley County employee to remove his clothes (Deposition of Steve Bumpas, pp. 4, 48 [cited excerpts from the deposition of Steve Bumpas are attached hereto as Exhibit I]). The remainder of the fact stated remains uncontroverted.

79.     Plaintiff's accusation as to Officer Clarkson's credibility is not an effect controversion of the fact. "Simple hope that a jury will not believe the testimony of defendants that has been

submitted in support of a summary judgment motion will not defeat the motion where there has been no affirmative evidence submitted to counter the defendants' evidence." *Berman v. Parco*, 986 F. Supp. 195, 200 (S.D.N.Y. 1997).

80.   Defendants understand from plaintiff's response that plaintiff has no evidence to the contrary but simply disbelieves the stated fact.  This is not sufficient to controvert the stated fact. *See* Reply to ¶ 79.

In addition, Stearns testified about what Officer Clarkson, who he described as the "balding" officer, did while he was in the cell during the search.  He was asked what Clarkson did:

Q.   What did he do in the cell?

A.   Just looked at me

Q.   Okay.  He didn't frisk you, true?

A.   Not that I -- no, no, he didn't

Q.   He didn't take your property, true?

A.   Yes, I think property was handed to him

Q.   But he didn't remove it from your person?

A.   No.

Q.   Did he tell you to undress?

A.   I think he did tell me to cooperate and undress.

Q.   So you think Officer Clarkson told you to undress?

A.   All of them were.  All the guys in the cell were just like, cooperate, cooperate.

\* \* \*

-14-

Q.   What I'm asking for is do you specifically recall he said undress?

A.   No.

(Stearns Depo., pp. 180-81).  Defendants submit the uncontroverted facts show Officer Clarkson was

a mere observer of the search.

81.   No mention of time was stated or implied in the uncontroverted fact.  The video

shows that at 5:04:41 Stearns began to take his shirt off.  Officer Clarkson left the cell at 5:05:39.

(Clarkson Depo., pp. 96, 107).  When Clarkson left the cell, Stearns was facing a wall away from

Clarkson. (Clarkson Depo., p. 107).  Defendants submit this fact remains uncontroverted.

85.-86.   Please see the defendants' reply to ¶¶ 75 and 79.

87.   Plaintiffs make a bit too much of Officer Clarkson's affidavit.  Officer Clarkson

stated his concern that Stearns could have a weapon, just as many arrestees could have weapons.

No officer, including Officer Clarkson, claimed he had facts to justify a specific belief that Stearns

had a weapon.  Officer Clarkson, as noted earlier, was concerned that Stearns could be a danger to

officers, as shown by the facts Clarkson then knew.  Those facts did not cause Clarkson to search

Stearns at the scene, most likely because Stearns' hands were cuffed.

At the jail, the situation changed somewhat due to Deputy Campbell's concern about Stearns

saying he would "take care of business."  Those concerns caused Campbell to ask Clarkson to stay

with Stearns and the other officers for safety reasons. (Clarkson Depo., pp. 53, 57).

88.   Plaintiff apparently contests only the time when the report was prepared which is

immaterial to the contents thereof.

89.   Plaintiff's response wholly fails to address the substance of the proffered fact.  The

evidence shows that the decision to strip search Stearns and all commands and directions for the

search came from Steve Bumpas, a jailer employed by the Cowley County Sheriff. (Bumpas Depo.,

p. 48).  Once Stearns arrived at the jail he was in the custody of the jail and jail personnel decided how to handle him.  It was the jail's decision to strip search Stearns. (Bumpas Depo., p. 50).

## SUPPLEMENTAL ARGUMENTS AND AUTHORITIES

In their initial summary judgment memorandum, as well as their response to plaintiff's Rule 56(f) affidavit, the Winfield Defendants provided the Court with substantial legal arguments and supporting authorities demonstrating their entitlement to summary judgment on qualified immunity grounds.  Defendants also recognize that they will have an opportunity to file a reply brief (although, depending upon the breadth of the plaintiff's supplemental response, defendants may need to request the Court's indulgence for a reply exceeding the five pages currently allotted.).

For purposes of this supplemental response, plaintiffs will simply emphasize a few points regarding qualified immunity in general and its application to the plaintiff's claims herein.

In order to establish that the actions of the Winfield Defendants violated his constitutional rights, plaintiff must do more than show that the defendants made a mistake in judgment or could have chosen a better option.  Rather, plaintiffs must demonstrate that the defendants actually "violated the law." *Hinton v. Elwood*, 997 F.2d 774, 779 (10th Cir. 1993).  The Supreme Court explained this requirement quite succinctly in *Malley v. Briggs*, 475 U.S. 335, 341 (1986), stating, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." The Winfield Defendants fall into neither category and are entitled to immunity.

## I.
### THERE WAS PROBABLE CAUSE TO ARREST STEARNS

Stearns' primary complaint against the Winfield Defendants is that they arrested him without probable cause in violation of his Fourth Amendment rights.

> When a warrantless arrest is the subject of a § 1983 action, the arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to make the arrest. *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir.1995). "Probable cause exists *if facts and circumstances within the arresting officer's knowledge* and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id.* (quotation omitted). But "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Id.* (quotation omitted).

*Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1191 (10th Cir. 2007) (emphasis added).

As indicated by the emphasized language, a determination of whether there was probable cause to make an arrest must be analyzed from the viewpoint of the officer based upon the information available to him at the time he made the decision to arrest. If it later turns out that not all of that information was accurate, this cannot retroactively undo the officer's probable cause determination. As stated in *Qian v. Kautz*, 168 F.3d 494, 943-54 (7th Cir. 1999):

> A police officer has probable cause to arrest when, at the moment the decision is made, the facts and circumstances within her knowledge and of which she has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense. *United States v. Seifullah Muhammad*, 120 F.3d 688, 696 (7th Cir.1997), citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). This flexible, commonsense approach does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable. *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Moreover, this is an *ex ante* test: the fact that the officer later discovers additional evidence unknown to her at the time of the arrest is irrelevant to whether probable cause existed at the crucial time. *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir.1994); *Maltby v. Winston*, 36 F.3d 548, 557 (7th Cir.1994).

Under K.S.A. 22-2401(c)(2)(B), a law enforcement officer may arrest a person if the officer has probable cause to believe that the person has committed a misdemeanor and may cause injury

-17-

to self or others or damage property unless immediately arrested.  As noted above, at the time Officer

Clarkson arrested Stearns he understood, from sources he could reasonably trust, that the following

had occurred:

- A 911 call reported that Stearns had been in O'Kelly's bar and made comments about getting revenge against the police for the shooting his father;

- Stearns had made profane and angry comments to Officer Walker about the shooting of Stearns' father when Stearns was stopped by Officer Walker for speeding;

- Stearns had been on the porch of Officer Venable's home late at night;

- Stearns had had a verbal altercation with Officer Venable in which he used profane and defiant language and again referenced the shooting of his father by police;[3]

- The County Attorney agreed with law enforcement officials that probable cause existed to arrest Stearns and was in the process of preparing a Complaint/Information against Stearns.

Stearns' present efforts to dispute or minimize some of this information, such as his

contention that his profanity was not spoken in anger, is irrelevant.  The important fact is that the

information possessed by Officer Clarkson provided him with probable cause to arrest Stearns.

Officer Clarkson was not required to conduct an in-depth legal analysis of the information

with which he had been provided.  Based upon his experience as a law enforcement officer, and

guided by legal advice obtained by his superior from the County Attorney, he made a reasoned

judgment that the safety of the public and his fellow officers required an immediate arrest of Stearns.

---

[3] Grounds for arrest also exist if any crime is committed in the presence of an officer. K.S.A. 22-2401(d). Officer Venable testified that Stearns' behavior in this altercation provided sufficient grounds for Venable to make an arrest for disorderly conduct at that time, even though he elected not to. The fact that an arrest was not actually affected until later does not minimize the strength of the grounds provided by the altercation alone.

The evidence is more than sufficient to support this determination.  As the Kansas Supreme Court recently held:

> "'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [Citation omitted.] Probable cause exists where 'the facts and circumstances within [the acting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. [Citation omitted.]"

*State v. Fewell*, —Kan.—, 184 P.3d 903, 910 (2008) (quoting *Draper v. United States*, 358 U.S. 307, 313 (1959)).

The arrest of Stearns was justified and resulted in no constitutional violation.  The Winfield Defendants are entitled to summary judgment on all counts arising out of the arrest.

## II.
### THE WINFIELD DEFENDANTS CANNOT BE LIABLE FOR THE STRIP SEARCH

It is undisputed that the decision to conduct a strip search of Stearns was made by employees of Cowley County and that County employees actually carried out the search.  Officer Clarkson as present during the search but he did not participate in any way and, in fact, did not even understand that a strip search had been conducted until he viewed a videotape at a later time.

It is unnecessary for the Court to determine, for purposes of this motion, whether the search itself violated Stearns' rights.  Regardless of whether violation occurred, it is clear that the Winfield Defendants have no liability because they did not order or conduct the search.

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  "The plaintiff must show the defendant personally participated in the alleged violation . . . and conclusory

allegations are not sufficient to state a constitutional violation." *Jenkins v. Wood*, 81 F3d 988, 994 (10th Cir. 1996). *See also Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1193 (10th Cir. 2007) ("It is axiomatic that, to prevail on a damages claim for a constitutional violation pursuant to § 1983, the plaintiff must show that the defendant, acting under color of state law, 'personally participated in the alleged violation.'")

Courts have consistently held that "just being there" is not a basis for holding an officer liable for constitutional violations.  In *Smith v. Barber*, 316 F. Supp. 2d 992, 1012 (D. Kan.), the court dismissed a claim against an officer arising out of a home search, reasoning that he "cannot be found liable for his mere presence at [plaintiffs'] home; rather, they must show that he personally participated in the search that allegedly violated their Fourth Amendment rights." *See also Calvi v. Knox County*, 470 F.3d 422, 429, 429 (1st Cir. 2006) (officer's "mere presence at the scene, without more, does not by some mysterious alchemy render him legally responsible under section 1983 for the actions of a fellow officers, and second officer who was "mere observer" of fingerprinting at which excessive force was allegedly used likewise could not be liable under section 1983); *Harper v. Albert*, 400 F.3d 1052, 1066 (7th Cir. 2005) ("[Officer's] 'mere presence' during Harper's transfer from the strip-search area to a segregation cell does not, without more, rise to the level of violation of Harper's constitutional rights, and is not sufficient to withstand a rule 50 motion."); *Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984) ("As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability." [citing *Rizzo v. Goode*, 423 U.S. 362 (1976)]).

Officer Clarkson had no role in the strip search and did not even realize one was being conducted.  He and the other Winfield Defendants cannot be liable for an alleged violation with which they had no involvement.

## CONCLUSION

For the reasons stated above and in their opening memorandum, defendant request that their motion for summary judgment be granted.

Respectfully submitted,

FLEESON, GOOING, COULSON & KITCH, L.L.C.


By  /s/ Stephen E. Robison
    Stephen E. Robison - #08665
    Charles E. Millsap - #09692
    301 N. Main, 1900 Epic Center
    Wichita, Kansas 67202
    Telephone: (316) 267-7361
    Facsimile: (316) 267-1754
    *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Christopher M. McHugh
JOSEPH & HOLLANDER, P.A.
500 North Market Street
Wichita, Kansas  67214-3514
*Attorneys for Plaintiffs*

Edward L. Keeley
MCDONALD, TINKER, SKAER, QUINN & HERRINGTON, P.A.
500 R. H. Garvey Building
300 West Douglas
Wichita, Kansas 67202-2909
*Attorneys for Cowley County Defendants*


    /s/ Stephen E. Robison