## In The Matter Of:

## *Daniel N. Stearns v.*
## *The Board of County Commissioners, et al.*

## *JERRY EUGENE DEVORE*
## *March 13, 2008*





Court Reporting Service, Inc
River Park Place - 727 N. Waco, Suite 360
Wichita, KS 67203    (316) 267-1201
www.crsreporting.com

EXHIBIT E

*Original File NR343.txt*
**Word Index included with this Min-U-Script®**

Case 6:07-cv-01145-MLB-KMH   Document 96-6   Filed 07/17/08   Page 2 of 6

Daniel N. Stearns v.
The Board of County Commissioners, et al.

JERRY EUGENE DEVORE
March 13, 2008

**Page 9**

[1] said it?
[2] A Because we were aware that Mr. Stearns was the
[3] son of the man that had been shot and we knew
[4] that emotions were high and we were trying to
[5] monitor that.
[6] Q Tell me about the next time, if there was one,
[7] that an officer approached you with information
[8] about Mr. Stearns.
[9] A That's when we got the phone call from
[10] O'Kelley's Bar about some statements that
[11] Mr. Stearns had made in the bar and Detective
[12] Gordon was following up on that and Detective
[13] Gordon briefed me on the statements that had
[14] been made in the bar.
[15] Q Did you speak with anyone else -- well, let me
[16] ask it this way: Was -- you said Detective
[17] Gordon? Sergeant Gordon or Detective?
[18] A Detective sergeant.
[19] Q Oh, I'm sorry. Detective Gordon, was Detective
[20] Gordon the first person who informed you of
[21] this 911 call?
[22] A I believe one of the lieutenants, the day shift
[23] lieutenant told me about the call but wasn't
[24] aware of all the information. But then
[25] Detective Gordon later briefed me on what had

**Page 10**

[1] taken place and that he was investigating it
[2] and taking care of it.
[3] Q When you say --
[4] A The day shift lieutenant told me basically that
[5] O'Kelley's had called because Mr. Stearns had
[6] been in there making some remarks and that
[7] Gordon, Detective Gordon was following up on
[8] what had been said or done.
[9] Q Do you remember when you had this conversation
[10] with this lieutenant?
[11] A It was the morning after the phone call or the
[12] day of.
[13] Q And the lieutenant told you that there had been
[14] some remarks made; is that correct?
[15] A Mr. Stearns had made some remarks or said
[16] something at the bar that the -- the person
[17] running the bar thought we should know about.
[18] Q Did he get any more specific about what remarks
[19] had been made?
[20] A No.
[21] Q And the lieutenant told you that Detective
[22] Gordon was following up?
[23] A Yes.
[24] Q And then later, you had a conversation, is that
[25] correct, with Detective Gordon about his

**Page 11**

[1] follow-up; is that right?
[2] A That's correct.
[3] Q Do you remember if your conversation with
[4] Detective Gordon was before or after the arrest
[5] of Mr. Stearns?
[6] A It was before.
[7] Q Before. Please tell me, if there was one, tell
[8] me about the next time someone came to you with
[9] information about Mr. Stearns.
[10] A I believe the next time I was con -- I had
[11] information on Mr. Stearns is the morning after
[12] Mr. Stearns had gone to Venable's house and
[13] Venable had talked to him in the street and
[14] Lieutenant Weber was briefing me on that
[15] situation. Lieutenant Weber had already talked
[16] to Chris Smith briefly about charges that might
[17] be filed on that, and then Chris Smith called
[18] and talked to me about it later in the morning.
[19] Q Do you remember what time in the morning your
[20] conversation with Mr. Weber was?
[21] A It would have been somewhere between 8:00 and
[22] 10:00.
[23] Q A.M.?
[24] A A.M.
[25] Q As best you can remember, what did Mr. Weber

**Page 12**

[1] tell you?
[2] A He told me that apparently Mr. Stearns had gone
[3] to -- had been at Venable's house, rang the
[4] doorbell, banged on the door, Mr. Venable's
[5] wife became very scared and alarmed and called
[6] the station; and then later on in the morning,
[7] Officer Venable had run across Mr. Stearns who
[8] came out into the street and Mr. Stearns had
[9] had some conversation with Officer Venable.
[10] Q Did Officer Weber brief you on what kind of
[11] conversation occurred?
[12] A He just said that Mr. Stearns was very vocal,
[13] was somewhat obscene and, you know, in his
[14] remarks.
[15] Q Did Mr. Weber tell you anything about his
[16] conversation with Mr. Smith?
[17] A He said that he had briefed -- that he had
[18] called Mr. Smith and talked to him about it,
[19] about potential charges that might come out of
[20] this. Chris was going to look into some stuff
[21] and call and get back with me or Kurt, Officer
[22] Weber.
[23] Q And Mr. Smith actually did call you; is that
[24] correct?
[25] A Yes.

Case 6:07-cv-01145-MLB-KMH   Document 96-6   Filed 07/17/08   Page 3 of 6

JERRY EUGENE DEVORE
March 13, 2008

Daniel N. Stearns v.
The Board of County Commissioners, et al.

Page 13

[1] Q And what did Mr. Smith tell you?
[2] A Based on the information that he had thus far,
[3]   after talking to Officer Weber and the
[4]   information he had thus far, that he felt that
[5]   we had probable cause for arrest for disorderly
[6]   and felt like that with this escalating
[7]   situation that we should probably get
[8]   Mr. Stearns picked up before something else
[9]   happened.
[10] Q Did Mr. Smith say anything about a warrant?
[11] A He said that he would do the paperwork and get
[12]   the complaint filed over there.
[13] Q And you knew that you can't file a complaint
[14]   without a warrant; is that correct?
[15]   MR. ROBISON: Other way around.
[16] A Other way around.
[17]   BY MR. McHUGH:
[18] Q I'm sorry, you can't file a -- yes, right,
[19]   that's right, I'm sorry. You knew that a
[20]   complaint and a warrant went together?
[21] A Yes.
[22] Q Okay. Did Chris Smith tell you anything else?
[23] A Just that he would be taking care of filing the
[24]   paperwork to get this done.
[25] Q How did you proceed?

Page 14

[1] A I put the word out to the officers that if we
[2]   ran across Mr. Stearns we should probably go
[3]   ahead and take him into custody, and I started
[4]   working with some of my officers to find a
[5]   location where Mr. Stearns might be staying. I
[6]   had some of my officers start working on that.
[7] Q Which officers?
[8] A Mr. Clarkson when he came on duty in the
[9]   afternoon.
[10] Q Did you speak to Mr. Clarkson in person?
[11] A Yes, when he came on. He believed that he had
[12]   a proper address for him, and I said, well, go
[13]   ahead and get him picked up.
[14] Q Did you brief Officer Clarkson at all on what
[15]   you knew about the case?
[16] A Yes, I did.
[17] Q What did you tell Mr. Clarkson?
[18] A I told him that there had been an incident that
[19]   night with Mr. Stearns going to Venable's
[20]   residence and that we had found -- and that
[21]   Officer Venable had also run across him on the
[22]   street at a later time and that Mr. Stearns was
[23]   very vocal, very aggravated, upset about this
[24]   situation. It also came to light through the
[25]   day that Mr. Stearns had possibly been down to

Page 15

[1]   Deputy Tom Campbell's residence. This also
[2]   came in to play with the prosecutor's decision.
[3] Q When did that come to light?
[4] A Later in the morning. Late in the morning
[5]   because we had just found out about it when I
[6]   talked to Chris, and we weren't sure of that
[7]   situation yet.
[8] Q How did -- how were you informed of the
[9]   situation?
[10] A One of my -- I can't even remember which
[11]   officer it was, one of my officers came to me
[12]   and told me that apparently Mr. Stearns had
[13]   also been down to Deputy Campbell's residence
[14]   looking over -- looking in the windows of the
[15]   cars or something. And that was late in the
[16]   morning that I found that out.
[17] Q Did the officer say that Mr. Stearns was
[18]   positively identified?
[19] A No.
[20] Q What did he say about the identification, if
[21]   anything?
[22] A That he believed it was Mr. Stearns, they had a
[23]   vehicle description that they believed
[24]   Mr. Stearns had been driving.
[25] Q Did he give you that description?

Page 16

[1] A I can't remember correctly; it was a pickup, I
[2]   believe. That's all I can remember about the
[3]   description of the vehicle.
[4] Q Did this officer tell you why he thought this
[5]   pickup belonged to or was possessed by or
[6]   driven by Mr. Stearns?
[7] A No. Just that Deputy Campbell believed it was
[8]   possibly Mr. Stearns.
[9] Q So this officer that was briefing you, had he
[10]   received his information from Officer Campbell?
[11]   Is that correct?
[12] A I believe so.
[13] Q Did you ever talk to Officer Campbell?
[14] A No, I did not.
[15] Q Did you talk to anyone else about this incident
[16]   with the pickup and I believe you said looking
[17]   in windows of a patrol car or something like
[18]   that?
[19] A My conversation with Chris, our decision was
[20]   based upon information we had prior to finding
[21]   out about Mr. Campbell's incident.
[22] Q So neither Mr. Smith nor you made any decisions
[23]   based on this Officer Campbell incident; is
[24]   that correct?
[25] A I didn't.

Case 6:07-cv-01145-MLB-KMH   Document 96-6   Filed 07/17/08   Page 4 of 6

Daniel N. Stearns v.
The Board of County Commissioners, et al.

JERRY EUGENE DEVORE
March 13, 2008

Page 17

[1] Q You didn't?
[2] A I don't know whether Chris knew about the
[3]   Campbell incident when he talked to me or not.
[4]   It did not come up in our conversation when I
[5]   talked to Chris, so I don't know whether Chris
[6]   knew about that or not.
[7] Q But you know it didn't factor into your
[8]   decision on ordering the arrest of Mr. Stearns;
[9]   is that correct?
[10] A I had already made the decision that, along
[11]   with Chris, that we needed to go ahead and get
[12]   Mr. Stearns arrested.
[13] Q If I'm understanding you correctly, it really
[14]   wasn't your decision at that point; if there
[15]   was a warrant issued, you would have to serve
[16]   the warrant?
[17] A Well, let me clarify --
[18] Q Okay.
[19] A -- the thought process. I had talked to Chris,
[20]   Chris told me based upon the information he
[21]   knew of what had been taking place with
[22]   Mr. Stearns that night and prior to that night,
[23]   with the threats made in the bar and so forth,
[24]   Chris felt like that we needed to go ahead and
[25]   get him arrested before something else happened

Page 18

[1]   and that he would take care of the paperwork.
[2] Q And it was your impression that meant he was
[3]   going to get a warrant?
[4] A Yes.
[5] Q And it's your job to serve warrants?
[6] A Yes.
[7] Q Was there any urgency in picking up Mr. Stearns
[8]   on this warrant?
[9] A We felt like there was because there was -- his
[10]   behavior was escalating and his attitudes and
[11]   his behavior and what he was doing and saying,
[12]   and we felt like that we probably should get
[13]   him picked up before something serious
[14]   happened, before he hurt somebody or got hurt.
[15] Q Do you know when Mr. Stearns was eventually
[16]   arrested?
[17] A Late that afternoon or evening, I believe. Let
[18]   me refer back.
[19] Q Sure. Certainly refer, if you need to, to your
[20]   affidavit.
[21] A I don't believe I've got it in my report as to
[22]   when he was actually arrested.
[23]   MR. ROBISON: You don't have a
[24]   report, that's an affidavit.
[25] A My affidavit, I'm sorry.

Page 19

[1]   MR. ROBISON: Well, I -- we're used
[2]   to seeing reports.
[3] A Yes, I'm used to -- excuse me.
[4]   MR. ROBISON: You're a big shot, you
[5]   don't write reports anymore, do you?
[6] A Not for the courts, no. I'm sorry, I don't --
[7]   I don't have the time at which he was arrested.
[8]   BY MR. McHUGH:
[9] Q If I asked you this, I'm sorry, I don't
[10]   remember your answer, do you remember when your
[11]   conversation with Mr. Clarkson or Officer
[12]   Clarkson occurred?
[13] A That was the afternoon.
[14] Q That was in the afternoon?
[15] A That was in the afternoon.
[16] Q If there was a delay between your conversation
[17]   with Officer Clarkson and the eventual arrest
[18]   of Mr. Stearns, can you think of an explanation
[19]   for that delay?
[20] A Just --
[21]   MR. SNOOK: I'm going to object as
[22]   calling for speculation. Sorry, go ahead,
[23]   Chief.
[24]   BY MR. McHUGH:
[25] Q Well, let me ask -- that's a good -- let me ask

Page 20

[1]   you, do you know if there was a delay?
[2] A No, other than simply trying to locate him and
[3]   find out where he was. Or make sure the
[4]   addresses were proper.
[5] Q And Officer Clarkson had told you, I've got a
[6]   good address for him?
[7] A Clarkson believed that he could locate a good
[8]   address or come up with a good address, yes.
[9] Q Did you have any further conversations with
[10]   Officer Clarkson?
[11] A He told me -- he called me later to inform me
[12]   that Mr. Stearns had been arrested without
[13]   incident.
[14] Q Did you have any conversations with Officer
[15]   Clarkson on how this arrest was going to take
[16]   place?
[17] A He simply told me that there was some deputies
[18]   there that were going to go to assist him.
[19] Q Did you have any conversations about whether
[20]   firearms were going to be used?
[21] A No.
[22] Q Did you have any conversations as to whether --
[23]   or how the officers were going to be dressed?
[24] A No.
[25] Q Chief DeVore, I'm going to hand you what's been

Case 6:07-cv-01145-MLB-KMH   Document 96-6   Filed 07/17/08   Page 5 of 6

| JERRY EUGENE DEVORE | Daniel N. Stearns v. |
| --- | --- |
| March 13, 2008 | The Board of County Commissioners, et al. |

Page 21

[1] previously marked as Deposition Exhibit Number
[2] 5 and ask you if you recognize it?
[3] A  This is from our personnel manual, our
[4] personnel procedure manual for the City of
[5] Winfield, number 3.24, arrest procedures.
[6] Q  Is that the procedure for arresting someone
[7] used by your department?
[8] A  Yes.
[9] Q  In your affidavit, you mention a practice of
[10] the police department concerning whether or not
[11] the police department actually gets written
[12] warrants. Would you explain to me what that
[13] practice entails? Well, let me refer to your
[14] affidavit, paragraph 11 --
[15] A  Uh-huh.
[16] Q  -- is the practice I'm referring to.
[17] A  Uh-huh.
[18] Q  And paragraph 12 speaks about it as well.
[19] A  The regular practice of carrying out arrests
[20] based upon oral communication of the county --
[21] Cowley County attorney, without the county
[22] attorney delivering paper warrants to the
[23] police department.
[24] Q  Can you explain any further what that practice
[25] entails?

Page 22

[1] A  That after communication with the prosecutor's
[2] office and determining that there is probable
[3] cause for arrest and the immediate arrest is
[4] warranted and that the prosecutor's office is
[5] going to complete the required paperwork, we
[6] can go ahead and arrest.
[7] Q  Is that a practice that your officers are aware
[8] of?
[9] A  Yes.
[10] Q  Is that a practice that you -- well, let me ask
[11] it this way: Have you done anything to
[12] discourage that practice?
[13] A  No.
[14] Q  Is there any way that you or your officers
[15] confirm that a warrant has been filed?
[16] A  If we complete the arrest before the warrant is
[17] issued or the complaint is filed, we have no
[18] way to confirm it until after the paperwork is
[19] completed by the prosecutor's office.
[20] Q  Okay. Well, let me -- I'm confused so I want
[21] to get this clear. In your mind, were you
[22] arresting -- were you ordering the arrest of
[23] Mr. Stearns on a warrant, or were you ordering
[24] the arrest of Mr. Stearns on probable cause?
[25] A  During my conversation with Chris, Chris

Page 23

[1] determined that there was probable cause for
[2] the arrest and that if we did not arrest
[3] immediately that something more serious might
[4] happen, somebody might get hurt, either
[5] Mr. Stearns or somebody else, and that we
[6] should arrest him without delay; and that Chris
[7] said that he would file the paperwork, the
[8] complaint and the required paperwork to support
[9] the arrest.
[10] Q  Okay. So I --
[11] A  And this -- knowing that the arrest -- or the
[12] warrant would be issued, or the complaint would
[13] be filed and a warrant issued, we arrest on
[14] that basis. Also we arrested on the basis that
[15] he had -- we had probable cause that he had
[16] committed a crime and that if we did not arrest
[17] that something more serious might happen, if we
[18] did not arrest without delay.
[19] Q  You say in your affidavit that you formed an
[20] independent opinion as to whether probable
[21] cause existed.
[22] MR. ROBISON: 14.
[23] BY MR. McHUGH:
[24] Q  Yeah, independent belief, I'm sorry, that
[25] probable cause existed.

Page 24

[1] A  Uh-huh, yes, that was my independent belief.
[2] Q  Right. What did you base that belief on at the
[3] time?
[4] A  The information that I had received from my
[5] lieutenant about the incident at Venable's
[6] residence and the incident where Officer
[7] Venable talked to him in the street and also
[8] the incident of the remarks made at the bar and
[9] Officer Walker's traffic stop. These all came
[10] in to my conclusion and belief that there was
[11] probable cause for the arrest based on his
[12] behavior that night with Officer Venable and at
[13] the Venable residence. But also knowing all
[14] this other information and believing that
[15] Mr. Stearns' behavior was escalating, I
[16] believed that we should arrest without delay
[17] before something more serious should happen.
[18] Q  You say that you believed you had probable
[19] cause, probable cause to believe that what
[20] crime had been committed?
[21] A  Disorderly conduct based on his behavior at the
[22] Venable residence and with Mr. Venable.
[23] Q  What about the behavior at the Venable
[24] residence made you think that the crime of
[25] disorderly conduct had been committed?

Case 6:07-cv-01145-MLB-KMH   Document 96-6   Filed 07/17/08   Page 6 of 6

| Daniel N. Stearns v. | JERRY EUGENE DEVORE |
| --- | --- |
| The Board of County Commissioners, et al. | March 13, 2008 |

**Page 25**

[1] A  At 12:30, 1:00 o'clock in the morning, ringing
[2]    a doorbell, pounding on the door, causing the
[3]    occupant of that residence to become scared and
[4]    alarmed to the point where they call the
[5]    police, that, you know, that would possibly be
[6]    disorderly conduct; that would be probable
[7]    cause for disorderly conduct. And then also
[8]    the behavior on the street with Officer
[9]    Venable.
[10] Q  What about the behavior on the street with
[11]    Officer Venable made you think there was
[12]    probable cause to arrest for disorderly
[13]    conduct?
[14] A  The -- the yelling or the raised voice, the
[15]    obscene remarks, the physical gestures of
[16]    pointing and the animated gestures and so
[17]    forth.
[18] Q  You said you took that into consideration with
[19]    some other information?
[20] A  Yes.
[21] Q  The incident with Officer Walker that Officer
[22]    Walker had briefed you on?
[23] A  Uh-huh.
[24] Q  What about Officer Walker's encounter with
[25]    Mr. Stearns led you to believe there was

**Page 26**

[1]    probable cause for a disorderly conduct -- to
[2]    believe disorderly conduct had been committed
[3]    by Mr. Stearns?
[4] A  The contact with Mr. Walker and the behavior at
[5]    the bar were what I used to indicate that
[6]    Stearns was formulating a pattern of behavior.
[7] Q  What -- how did you conclude there was a
[8]    pattern of behavior, and let's talk first about
[9]    the Officer Walker incident? What, from the
[10]    Officer Walker incident, led you to the
[11]    conclusion there was a pattern of behavior?
[12] A  Well, Officer Walker had had contact with him,
[13]    and Mr. Stearns had made some remarks about the
[14]    police department killing his father. I don't
[15]    believe that there was any profanity or
[16]    anything at that time that I am aware of.
[17] Q  Anything else from that incident?
[18] A  Just that incident.
[19] Q  Okay. What about the incident, the 911 call,
[20]    what about that specifically made you think
[21]    there was a pattern of conduct?
[22] A  He had been in the bar making remarks and
[23]    possible threats towards the personnel of the
[24]    police department.
[25] Q  What kind of remarks?

**Page 27**

[1] A  He was going to get even or something along --
[2]    I can't remember exactly what the remarks were.
[3]    But they were -- they were -- they could be
[4]    interpreted as threats towards the personnel of
[5]    the police department.
[6] Q  Oh, okay, so the remarks and the threats were
[7]    something to the extent of, say it again, I'm
[8]    sorry.
[9] A  He might get even or get even with the officers
[10]    or something -- I can't remember exactly what
[11]    was said in his remarks. Going to get them
[12]    back or get back at them, done his daddy wrong
[13]    and he's going to get back at them. Paragraph
[14]    5.
[15] Q  At the time -- well, the day after this 911
[16]    call came in --
[17] A  Uh-huh.
[18] Q  -- was there a report generated?
[19] A  I believe Chad was working on follow-up and
[20]    then would generate a report.
[21] Q  So there hadn't been one as of the time that
[22]    you were first contacted about this 911 call;
[23]    is that correct?
[24] A  Not at that time.
[25] Q  What about the -- when Officer Walker came to

**Page 28**

[1]    speak with you about the traffic incident, did
[2]    he -- had he generated a report?
[3] A  I don't believe so.
[4] Q  Did you instruct him to generate a report?
[5] A  Not at that time.
[6] Q  Why not?
[7] A  I didn't believe that incident within itself
[8]    was enough to cause a problem. It was
[9]    something that we simply wanted to monitor and
[10]    remember. I did not instruct him --
[11] Q  Sure.
[12] A  -- to do a report.
[13] Q  Sure, I understand. Exhibit Number 5 --
[14] A  Uh-huh.
[15] Q  -- how do you make your officers aware of that
[16]    policy?
[17] A  When they're hired on, the -- part of their
[18]    field training or their training within the
[19]    department, the supervisor or training officer
[20]    will go through policies, procedures,
[21]    ordinances, those type of things with them.
[22] Q  How do your officers, if you know, learn about
[23]    practices that aren't in the manual?
[24] A  They will ask their supervisors or their
[25]    training officer about it and refer back to