IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

DANIEL N. STEARNS,                    )
                                      )
                    Plaintiff,        )     **CIVIL  ACTION**
                                      )
v.                                    )     No.  07-01145-MLB
                                      )
The BOARD OF COUNTY COMMISSIONERS     )
OF THE COUNTY OF COWLEY, KANSAS,      )
et al.,                               )
                                      )
                    Defendants.       )
_____)

## MEMORANDUM AND ORDER

This case comes before the court for the following:

1)   Defendants City of Winfield, Kansas ("City"), Winfield Police Chief Jerry DeVore, and Winfield Police Officer Floyd Clarkson's (collectively "Winfield defendants") motion and supplemental motion for summary judgment (Docs. 38, 96) and memoranda in support (Docs. 39, 96), plaintiff Daniel Stearns's supplemental response (Doc. 119) and Winfield defendants' reply (Doc. 129);

2)   Defendants Cowley County Sheriff Deputies Tom Campbell, Jeff Elston, Doug Allison, and Steven Deill's (collectively "arrest defendants") motion for summary judgment (Doc. 104) and memorandum in support (Doc. 105), plaintiff's response (Doc. 121) and arrest defendants' reply (Doc. 130);

3)   Defendants Cowley County Sheriff Corrections Officers Steve Bumpas, Roger Dobbs, and Defendant Deill's (collectively "strip search defendants") motion for summary judgment (Doc. 107) and memorandum in support (Doc. 108), plaintiff's response (Doc. 122) and strip search defendants' reply (Doc. 134); and

4)   Defendants Cowley County Attorney Christopher Smith and Cowley County Sheriff Bob Odell's motion for summary judgment (Doc. 114) and memorandum in support (Doc. 115), plaintiff's response (Doc. 123) and defendants' reply (Doc. 138).

This case alleges a violation of plaintiff's civil rights under 42 U.S.C. § 1983 and further alleges that all defendants committed several torts against plaintiff under state law.   Defendants all assert that they are entitled to qualified immunity for the acts that allegedly occurred and, having been granted qualified immunity, the court may decline to hear the state claims.

## I.   SUMMARY JUDGMENT STANDARDS

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.   Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim.   Adamson v. Multi Community Diversified Svcs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).   When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250 (1986).   If so, the court cannot grant summary judgment.   Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## II.   PROCEDURAL HISTORY

On October 15, 2007, Winfield defendants moved for summary judgment.   Plaintiff responded with a Rule 56(f) affidavit requesting specific discovery.   On February 20, 2008, the court granted plaintiff's 56(f) request and permitted limited discovery on the issue of qualified immunity. (Doc. 63).   Plaintiff deposed all individual defendants and discovery is complete on that issue.[1]   All defendants now have moved for summary judgment.

Plaintiff did not specifically controvert defendants' statements of facts in their supplemental motion and motions for summary judgment.   Defendants contend that plaintiff failed to directly respond to their facts as required by Fed. R. Civ. P. 56 and D. Kan. R. 56.1. (Docs. 129-30, 134, 138).   Plaintiff's responses incorporate his statement of facts in a series of questions under the heading "Genuine Issues of Material Fact."   Although this format is not contemplated by the rules and has made ruling on the motions more difficult, the court finds that it would not be consistent with Fed. R. Civ. P. 1 to send the case back for proper formatting.   Defendants overlook that plaintiff's responses incorporate his prior statement of controverted facts from his 56(f) affidavit (Doc. 52) and supplements those facts after additional discovery was done. (Docs. 119, 121-3).   However, plaintiff's counsel is admonished not to repeat the format in the future.   The following facts are either

_____

[1]Plaintiff amended his complaint on June 2, 2008. (Doc. 89)

uncontroverted or, if controverted, taken in the light most favorable, along with all favorable inferences, to plaintiff. See <u>Hall v. United Parcel Serv.</u>, No. Civ. A. 992467-CM, 2000 WL 1114841, at *5 (D. Kan. July 31, 2000) (citing <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670 (10th Cir. 1998)).   To the extent relevant, the factual disagreements between the parties will be noted.

**III.   FACTS**

   **Plaintiff's initial contact with WPD law enforcement officers**

      Plaintiff, a resident of Sweetwater, Texas traveled to Winfield, Kansas for his father, Daniel Fruits', funeral.   Fruits had been shot and killed by law enforcement officers following his commission of a crime.   Plaintiff was staying with his paternal grandparents.

      On March 18, 2006, a 911 dispatch came in from Blake Porter, an employee of O'Kelly's Bar.   Mr. Porter stated:

> I got, uh, Danny Fruits's son in here. ... I don't know
> that I'm gonna have an issue with him or not. But I was in
> the bathroom a little bit ago.  He had no idea who I am or
> anything about me.  But he was talkin' to one of the guys
> in the band, how the City cops done his daddy wrong and
> he's gonna get back at 'em and what have you.  So I don't
> know that I'll have an issue with him or not, but just kind
> of a heads up that he's in here.  (Doc. 119, exh. PP).

WPD authorities did not follow up on the call until March 24, the day after plaintiff had been released on bond.   Porter told Investigator Chad Gordon that he did not recall plaintiff making threats, but remembered him referring to the police as "pigs."   (Doc. 52 at 4).

      Three days later, March 21, WPD officer Ryan Walker stopped plaintiff for speeding.   Walker described the incident as follows:

> Mr. Stearns started the contact being very rude not giving
> his license to me when I asked.  I asked Mr. Stearns if he
> went to school in Winfield, and he replied that he was

-4-

> her[e] in town to because "we killed his fucking dad."[2]  I
> asked who his father was, and he told me that it was Danny
> Fruits.  He then changed his attitude and became polite
> with me the rest of the traffic stop.  (Doc. 52-26).

Plaintiff admits that he used profanity, but denies being rude or speaking loudly to Officer Walker.  Plaintiff did not threaten Officer Walker and was not arrested or issued a citation.  Officer Walker simply gave plaintiff a verbal warning.

Two days later, March 23, at approximately 12:30 a.m., plaintiff went to WPD officer Greg Venable's home and knocked on the door and/or rang the doorbell for approximately half a minute.  According to plaintiff, he was looking for a friend's home, which was next door, but mistakenly went to Officer Venable's home instead.  Officer Venable's wife was inside.  She called Officer Venable, who on duty at that time, and described plaintiff as a white male wearing a red and white jersey.  Ms. Venable heard plaintiff say "later," which she took as a threat.  She was alarmed and frightened by the incident and Officer Venable was concerned for the safety of his family and himself.

Plaintiff, however, insists that he did not say "later", never saw Ms. Venable, and was already leaving before Ms. Venable reached her door.  Plaintiff does not controvert that Ms. Venable was frightened, but points out that Officer Venable's report and Ms. Venable's statement do not say she was alarmed or frightened.

Ms. Venable described plaintiff's car as a newer model, gold colored, four door passenger car with big square tail lights.  After

---

[2]Plaintiff denies making this statement.  (Doc. 96-4 at 4, p. 39).

talking to his wife, Officer Venable drove around the block and saw plaintiff's car near his home, but no one was inside.[3]   Officer Venable took down Texas tag H05KJX.  He drove around the block again, but plaintiff's car was gone.

At approximately 3:38 a.m., Officer Venable saw a gold car and followed it to plaintiff's grandparents' driveway.  Plaintiff stepped out of the car and was standing by the road when Officer Venable approached.   Officer Venable wrote in Venable's report that the following dialog took place:

> As I was approaching him, he said "you're probably the mother fucker that shot my dad."  I told him that I did not know what he was talking about.  He told me that he was in town to bury his dad, Danny Fruits.  He said "you're not going to tell me if it was you or not are you?  You can't talk about it can you?"  I said "no."  Then he said "one of you mother fuckers did it.  It was probably Dougherty or Knoles."
> I asked him if he was ever on East 13th Avenue tonight, and he said "I can't remember.  It's none of your fucking business.  Don't you fucking worry about where I've been?" (Doc. 123-3 at 1).

Plaintiff controverts defendants' characterization of his speech or actions as loud and belligerent or threatening in any way. Plaintiff says he told Officer Venable to mind his own business because he did not think he was on 13th Street earlier[4] and was simply being harassed.  He acknowledges that he used profanity, but claims that he was cooperative.  Plaintiff asserts that he never yelled at

---

[3]Plaintiff testified at his deposition that he saw Officer Venable drive past.  He and a female were in the gold car.  "The female pushed [plaintiff's] head down and lowered her head out of sight so [Officer Venable] would not see them."  (Doc. 96 at 6).

[4]Plaintiff did not grow up in Winfield and says he did not know if he was on 13th Avenue during the night.

Officer Venable and Venable's report does not describe plaintiff as yelling or angry.  Regardless of what was said, it is uncontroverted that Officer Venable did not arrest plaintiff.[5]

**Chief DeVore and County Attorney Smith enter the picture**

Later that same day, at approximately 7:30 a.m., Officer Venable told WPD Lt. Kurt Weber about the incident with his wife and his encounter with plaintiff.  Lt. Weber then went to Cowley County Attorney Smith's office and told him about the two incidents.[6]  He also told Smith that plaintiff had pointed his finger at Officer Venable while using profanity and Venable smelled alcohol on plaintiff's breath.  According to Weber, Smith believed that plaintiff's statements to Officer Venable were threats and told Lt. Weber there was probable cause to arrest plaintiff for disorderly conduct on either incident.  Lt. Weber relayed this information to Winfield Police Chief DeVore.

Chief DeVore also spoke with Smith.  DeVore testified that WPD regularly carries out arrests based upon oral communications from the county attorney without him or her delivering paper warrants to WPD.  According to DeVore, Smith "informed him that [he] believed there was probable cause to arrest [plaintiff] for disorderly conduct and that [plaintiff] should be arrested before something else happened.  Smith was to do the paperwork and file the Complaint." (Doc. 96 at 9).

At approximately 11:23 a.m., Lt. Weber sent out a notice

_____

[5]Officer Venable testified that based upon plaintiff's disorderly conduct in the street, he had probable cause to arrest him at that time, but exercised his discretion not to do so.  (Doc. 96 at 8).

[6]Smith was already aware of the Fruits shooting.

authorizing any officer who may encounter plaintiff to arrest him.

For his part, Smith testified that police officers often came to his office for advice regarding probable cause. However, "he did not direct the arrest of [plaintiff] because the [Winfield Police Department], rather than the County Attorney, has that authority." (Doc. 96 at 8). Smith simply believed there was probable cause and agreed to draft a complaint.

Plaintiff notes that Chief DeVore's practice is contrary to WPD's written policy. WPD Rules and Regulations section 3.24 states:

> Whenever possible, a warrant will be obtained prior to making an arrest. When a valid warrant is placed in the hands of an officer for execution, it is his/her duty to carry out its demands without delay. (Doc. 52-30 at 1).

It is not necessary to decide whether the policy was violated. Regardless, a warrant was not obtained prior to plaintiff's arrest.

### Preparation for the arrest

Defendant WPD Officer Floyd Clarkson came on duty at 4:00 p.m. His first assignment was to arrest plaintiff at his grandparents' home. Clarkson testified that he had independent probable cause to arrest plaintiff based upon: "(1) the 911 call from O'Kelly's bar; (2) the incident with Officer Walker; and (3) the incidents at Venable's house and between [plaintiff] and Officer Venable." (Doc. 96 at 12). Clarkson claims that his shift supervisor informed him about the O'Kelly's bar incident. (Doc. 96 at 4). He also claims that Officer Walker's account of plaintiff's traffic violation was relayed to him prior to plaintiff's arrest. (Doc. 96 at 5).

Plaintiff controverts that Clarkson was aware of the O'Kelly's bar incident. Plaintiff also controverts that Clarkson was aware of

-8-

plaintiff's encounter with Officer Walker.  After plaintiff filed his complaint, Clarkson submitted an affidavit listing the reasons he independently believed there was probable cause to arrest plaintiff. However, Clarkson's report listed the information he had at the time plaintiff was arrested, which did not include the incident at O'Kelly's bar.  (Doc. 119 at 12).  Clarkson reported that he reviewed Officer Walker's supplemental narrative on plaintiff's traffic stop prior to plaintiff's arrest.  However, Officer Walker did not write his report until after plaintiff was arrested.[7]  (Doc. 119 at 14). Plaintiff contends that defendants were trying to justify his arrest on March 23, after the fact.  He points out that Investigator Gordon and Officer Walker's reports were not created until after he was arrested.  "[H]ardly anyone at the police department knew about the 911 call at the time [plaintiff] was arrested."  (Doc. 52 at 12).

At approximately 4:10 p.m., Deputy Sheriff Tom Campbell, who assisted Officer Venable in looking for plaintiff earlier, returned home and found his daughter very frightened.  Campbell's daughter stated that when she was on the front porch, she saw a white male whom she did not know.  The man walked behind Campbell's patrol car and was coming toward the house.  Upon seeing her, the man turned around quickly and left in a silver-colored truck, which looked like a Chevrolet.  Campbell's daughter described the man as being tall, but not as tall as Campbell, and slim.  She also stated that the man had

---

[7]Plaintiff sought to depose Officer Walker to question his reasons for writing "a narrative report on a routine traffic stop conducted without incident and why he wrote it more than seven days after the stop."  (Doc. 52 at 6).  Plaintiff, however, has not attached Officer Walker's deposition as an exhibit and the court does not know when his report was written.

a goatee or mustache and was wearing a bandana, blue jeans, and a black jacket or coat.  Based on his daughter's description, Campbell believed the man was plaintiff.  Campbell did not know what plaintiff looked like, but believed one of plaintiff's relatives owned a silver-colored truck. Campbell also testified that a couple of WPD officers told him about the incident at O'Kelly's bar, which is why he suspected plaintiff was at his house.[8]  (Doc. 105-4 at 19-20).

Campbell went to the WPD and told Sgt. Roark about the white male on Campbell's property.[9]  Sgt. Roark told Campbell that WPD was getting ready to arrest plaintiff.  Cowley County Sheriff Deputies Doug Allison, Jeff Elston, and Steven Deill were also notified that WPD was going to arrest plaintiff.  Clarkson asked Sgt. Allison to provide cover around the house during plaintiff's arrest.[10]  Deill, who was being trained by Sgt. Allison, was also assigned to cover the officers.  Supervisor Elston was told by the undersheriff to assist WPD in arresting plaintiff.  Cowley County Sheriff Correctional Officer Steve Bumpas was notified that plaintiff was about to be arrested and brought to the jail.

### The arrest

At approximately 5:00 p.m., law enforcement officers arrived at plaintiff's grandparents' home.  Clarkson and Campbell knocked on the

---

[8]Campbell did not know about the 911 call or which bar, specifically, where plaintiff made comments.  (Doc. 105-4 at 19).

[9]Clarkson remembers Campbell stating that the man left in a tan extended cab small size pickup truck.  However, Campbell does not remember telling Clarkson about the man on Campbell's property.

[10]It is common practice for Cowley County Sheriffs to assist WPD in making arrests.

front door while Supervisor Elston, Sgt. Allison, and Deill were in "cover" positions.  Plaintiff's grandmother answered the door.  An officer asked for plaintiff, who then came to the door.  Campbell claims that an officer said, "please step outside." (Doc. 105 at 13). Plaintiff, however, asserts that Campbell grabbed his hand and pulled him outside.  Plaintiff claims that one defendant pointed his rifle at him while Campbell pushed him against the wall and Clarkson handcuffed him.  Sgt. Allison and Supervisor Elston admit they were each carrying a rifle, but deny pointing their weapons at plaintiff. Clarkson told plaintiff that he was being placed under arrest at the direction of the County Attorney.  Campbell placed plaintiff in the front seat of his patrol car, but did not pat him down.

### The strip search

Campbell transported plaintiff to the jail.  No other officer rode with them.  During transport, plaintiff made several statements. Campbell wrote in his report:

> While going to the jail from the residence [plaintiff] was hollering and saying I was one of the "[f]uckers who killed [his] dad" and now we were jacking with him. [Plaintiff] said he was going to get things straightened out.  He then said "Yeah I'm going to take care of business, [y]ou know, I'm going to take care of [b]usiness."  I asked him what he was talking about and he just said he was going to take care of business.  (Doc. 105-5 at 3).

Campbell took plaintiff's statement, "you know I'm going to take care of business" as a threat.  However, plaintiff claims he stated:

> I asked him how come I was being arrested or how come he hadn't read me my rights or anything like that, ... I was asking him where were we going.  And he said, you know, I'm taking you to jail, you're going  to jail. ... and then I told him that, hey, you know, that I'm not a criminal, that I pay my taxes and that I work for a living and I take care of business, I'm not just some crook.  (Doc. 122-4 at 3).

-11-

Either WPD or one of the arrest defendants called Bumpas and told him that plaintiff was seen at officers' homes and was making threats. It is Cowley County jail combative detainee policy to notify the jail's shift supervisor ahead of time when an officer is bringing an arrestee who is possibly combative. (Doc. 108-4 at 40). At this time, Bumpas was not aware of plaintiff's alleged threat in Campbell's patrol car. Bumpas testified that he decided to strip search plaintiff "before he was booked to make sure he did not have any weapons with which he could hurt himself or anyone else." (Doc. 108 at 7).

After following Campbell to the jail, Sgt. Allison told Deill to go inside and help provide protection in case plaintiff became combative.[11] Supervisor Elston brought plaintiff into the jail, who was then placed alone in a holding cell. Plaintiff was patted down. (Doc. 122 at 14). Bumpas and Clarkson went inside the holding cell. Deill and Dobbs were outside the doorway looking in. Supervisor Elston was present while the handcuffs and items in plaintiff's pockets were removed, but left before the strip search began. Bumpas began taking items of plaintiff's property and handed them to Sgt. Allison, who left thereafter. Clarkson was present when plaintiff's strip search began and provided extra security for Bumpas.

Bumpas ordered plaintiff to remove his clothes. He inspected each article of clothing and then visually inspected plaintiff without physical contact. Plaintiff was not required to bend over and spread

_____

[11]Cowley County correctional officers do not carry weapons and it is standard practice for sheriff officers to be present during strip searches of combative arrestees.

-12-

his buttocks.  Dobbs, who was securing the outside holding cell door, was handed plaintiff's property from inside the cell.  No weapons, drugs, or contraband were found on plaintiff or his property.  There is no evidence that plaintiff was combative, either before or during the search.

After plaintiff was strip searched, he remained by himself in a holding cell for about one hour.  He was taken to be booked, but refused to answer some booking questions.  Plaintiff was placed back in the holding cell until he would cooperate.  He was later booked at approximately 10:40 p.m. and released on bond around 11:10 p.m.

## IV.   1983 CLAIMS

When law enforcement officers abuse their power, suits against them allow those wronged an effective method of redress.  See Anderson v. Creighton, 483 U.S. 635, 638 (1987) (citing Harlowe v. Fitzgerald, 457 U.S. 800, 814 (1982)).  Pursuant to 42 U.S.C. section 1983, any person who "under color of . . . [law] . . . subjects, or causes to be subjected, . . . any [person] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 was enacted to provide protections to those persons wronged by the misuse of power.  While the statute itself creates no substantive civil rights, it does provide an avenue through which civil rights can be redeemed. See Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir. 1995).  To state a claim for relief in a section 1983 action, plaintiff must establish that he was (1) deprived of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed under color of state law.  See American Mfr's. Mut. Ins. Co.

-13-

v. Sullivan, 526 U.S. 40, 49-50 (1999).

### a.   Qualified Immunity

While section 1983 permits the possible vindication of a plaintiff's rights, non-meritorious suits exact a high cost upon society and law enforcement personnel. See Anderson, 483 U.S. at 638. Indeed, the Supreme Court and the Tenth Circuit have recognized these suits may unduly interfere with the discharge of discretionary duties due to the constant fear civil litigation and potential monetary damages. See Harlowe v. Fitzgerald, 457 U.S. 800, 814 (1982); Wilson v. Stock, 52 F.3d 1547, 1552 (10th Cir. 1995). "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." Horstkoetter v. Department of Public Safety, 159 F.3d 1265, 1277 (10th Cir. 1998) (internal quotations omitted) (citing Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)).

In order to balance these competing interests, government officials performing discretionary duties are afforded qualified immunity shielding them from civil damages liability. Pearson v. Callahan, 129 S. Ct. 808, 815, 2009 WL 128768, at *6 (U.S. Jan. 21, 2009). Qualified immunity protects these officials unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Id.; Baptiste v. J.C. Penney Co., Inc., 147 F.3d 1252, 1255 (10th Cir. 1998). The defense not only provides immunity from monetary liability, but

perhaps more importantly, from suit as well.[12]  See Horstkoetter, 159 F.3d at 1277.

When a defendant claims qualified immunity, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's actions violated a constitutional right and (2) demonstrating the right allegedly violated was "clearly established" at the time the conduct occurred.  Pearson, 129 S. Ct. at 815-6.  As noted in Pearson, courts are no longer required to follow the two-step sequence mandated by Saucier v. Katz, 533 U.S. 194 (2001).  Id. at 818.  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Id.

If a plaintiff successfully thwarts defendants' qualified immunity defense, the ordinary summary judgment burden returns to defendants to show no material issues of fact remain that would defeat the claim of qualified immunity.  See Mick v. Brewer, 76 F.3d 1127, 1134 (10th Cir. 1996).  This standard requires the defendants to show there are no disputes of material fact as to whether their conduct was objectively reasonable in light of clearly established law and the information known to defendants at the time.  See id.  Even if a plaintiff is able to withstand summary judgment, the defendants are nonetheless able to reassert the defense of qualified immunity at

_____

[12]  One of the purposes of qualified immunity is to "protect public officials from the 'broad-ranging discovery' that can be peculiarly disruptive of effective government."  Anderson, 483 U.S. at 646 n.6.

trial.   See Gossett v. Oklahoma Bd. of Regents for Langston University, 245 F.3d 1172, 1181 n.5 (10th Cir. 2001).

### Clearly Established Constitutional Right

The Tenth Circuit requires the contours of the right at issue to be sufficiently clear that a reasonable official would have understood that what he was doing violated a constitutional right that was clearly established at the time the alleged acts took place.   See Cruz v. City of Laramie, 239 F.3d 1183, 1187 (10th Cir. 2001); Watson v. University of Utah Med. Ctr., 75 F.3d 569, 577 (10th Cir. 1996).  This standard, however, must be used in a particularized manner[13] because "[o]n a very general level, all constitutional rights are clearly established."  Horstkoetter, 159 F.3d at 1278.   Were this level of particularity not required, Harlowe "would be transformed from a guarantee of immunity into a rule of pleading," that would "destroy 'the balance that [Supreme Court] cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties.'"   Anderson, 483 U.S. at 639-40 (quoting Davis v. Scherer, 468 U.S. 183, 195 (1984)).

A plaintiff's burden at this stage has been described as "quite heavy," as it is insufficient to simply allege a violation of a general legal principle.   See Watson, 75 F.3d at 577.   In order to discharge his burden, a plaintiff must do more than simply identify

---

[13]    The Tenth Circuit "has held that for a right to be 'particularized,' there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or 'clearly established weight of authority' from other courts." Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir. 1995); see also Cruz v. City of Laramie, 239 F.3d 1183, 1187 (10th Cir. 2001); Horstkoetter v. Department of Public Safety, 159 F.3d 1265, 1278 (10th Cir. 1998).

in the abstract a clearly established right and allege that the defendants have violated it.  See Baptiste, 147 F.3d at 1255.  Rather, plaintiff must (1) articulate the constitutional right, (2) state, with specificity, the defendants' conduct that has allegedly violated this right, and (3) demonstrate a substantial correspondence between the conduct in question and prior law establishing that the defendants' actions were clearly prohibited.  See id.; Romero, 45 F.3d at 1475.  Unless such a showing is made, defendants prevail.  See Romero, 45 F.3d at 1475.

Plaintiff asserts that in one or more ways, defendants violated his Fourth Amendment right against unreasonable searches and seizures.  Specifically, plaintiff contends that he was arrested without probable cause and unreasonably stip searched.  Plaintiff further claims that Smith ordered plaintiff's unlawful arrest and Chief DeVore and Cowley County Sheriff Odell's inadequate training and policies fostered these violations.

The court finds that the general nature of plaintiff's 1983 claims are all clearly established constitutional rights.  See Oliver v. Woods, 209 F.3d 1179, 1188 (10th Cir. 2000) (noting that law enforcement officers must have either a warrant or probable cause to lawfully arrest individuals); Howard v. Dickerson, 34 F.3d 978, 982 (10th Cir. 1994) (concluding that the defendant officer violated the plaintiff's right against warrantless home arrests absent exigent circumstances); Archuleta v. Wagner, 523 F.3d 1278, 1283 (10th Cir. 2008) (holding that a strip search can violate the Fourth Amendment, depending on the circumstances); Warner v. Grand County, 57 F.3d 962, 968 (10th Cir. 1995) (stating that municipality may be liable when its

policies or deliberate indifference to inadequate training results in constitutional violations).  Defendants have not wasted the court's time by arguing or citing any authority suggesting otherwise. Plaintiff has met his burden to articulate the constitutional rights in question.

## Violation of Constitutional Right

To determine whether a plaintiff has sufficiently shown the violation of a constitutional right at all, this court must determine whether the plaintiff's allegations, if true, state a claim for a violation of a constitutional right.  See Romero, 45 F.3d at 1475 (relying in part upon Siegert v. Gilley, 500 U.S. 226, 231-32 (1991)). Determining whether a plaintiff has stated a claim for a constitutional violation is purely a legal question.[14]  See id. Despite the inevitable factual issues that become intertwined in the characterization of a plaintiff's precise constitutional claims, this court cannot avoid the legal issue by simply framing it as a factual question.  See Archer v. Sanchez, 933 F.2d 1526, 1530 n.7 (10th Cir. 1991).

### b.   Probable Cause

When a warrantless arrest is the basis for a 1983 claim, a plaintiff must show that the defendant officer lacked probable cause. Buck v. City of Albuquerque, 549 F.3d 1269, 1281 (10th Cir. 2008). "An officer may make an arrest without a warrant if the officer has probable cause to believe a crime has been committed by the arrestee."

---

[14]   Similarly, whether the right was clearly established at the time the incident occurred is also a legal question.  See Romero, 45 F.3d at 1475 (relying in part upon Siegert v. Gilley, 500 U.S. 226, 231-32 (1991)).

<u>Oliver</u>, 209 F.3d at 1186.  Probable cause exists if "facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." <u>Fogarty v. Gallegos</u>, 523 F.3d 1147, 1156 (10th Cir. 2008) (quoting <u>United States v. Edwards</u>, 242 F.3d 928, 934 (10th Cir. 2001)).

Under Kansas law, a warrantless arrest for a misdemeanor may be made when the officer has probable cause to believe that a person is committing or has committed a misdemeanor and also has probable cause to believe that:

> (A) The person will not be apprehended or evidence of the crime will be irretrievably lost unless the person is immediately arrested;
>
> (B) the person may cause injury to self or others or damage to property unless immediately arrested; or
>
> (C) the person has intentionally inflicted bodily harm to another person.

K.S.A. 22-2401.  It is unclear which, <u>if</u> <u>any</u>, of these bases were relied upon by the arresting officers.  But in addition, section 2401(d) also requires that the crime "has been or is being committed by the person in the officer's view."  Not only is there no evidence to support this statutory requirement, it is uncontested that plaintiff supposedly was being arrested for disorderly conduct which occurred (if defendants are to be believed) two or more days earlier. Nevertheless, the fact that plaintiff's arrest may have violated Kansas law does not translate to a Fourth Amendment violation.  <u>See</u> <u>United States v. Fisher</u>, 241 F. Supp. 2d. 1154, 1160-63 (D. Kan.

2002).  This is not to say that the officers' failure to follow Kansas law is irrelevant, but that is a matter for later determination.

In the context of 1983 claims, an officer is entitled to qualified immunity for a warrantless arrest when a reasonable officer would believe probable cause exists based upon the circumstances known at the time of the arrest.  <u>Romero</u>, 45 F.3d at 1476.  "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."  <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987)).  The operative words, of course, are "reasonably but mistakenly."

It is undisputed that Clarkson and arrest defendants Campbell, Elston, Allison, and Deill arrested plaintiff without a warrant. Plaintiff asserts that they lacked probable cause as well.  Arrest defendants take the position that there was probable cause to arrest plaintiff for disorderly conduct, a misdemeanor under Kansas law, which provides, in pertinent part:

> Disorderly conduct is, with knowledge or probable cause to believe that such acts will alarm, anger or disturb others or provoke an assault or other breach of the peace:
>
> *    *    *
>
> (c) Using offensive, obscene, or abusive language or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others.

K.S.A. 21-4101.

As justification for probable cause, Clarkson and arrest defendants cite plaintiff's run-ins with Officers Walker and Venable. The basis for their justification is unclear.  Assuming they were aware that plaintiff used profanity, profanity alone does not

-20-

constitute disorderly conduct under K.S.A. 21-4101. <u>State v. Huffman</u>, 228 Kan. 186, 193, 612 P.2d 630, 636 (Kan. 1980). Despite the fact that plaintiff used profanity in accusing the police of killing his father, the court finds that plaintiff's comments were not fighting words likely to incite immediate breach of the peace by defendants. <u>See</u> <u>United States v. McKinney</u>, No. 00-3228, 2001 WL 565745, at *2 (10th Cir. May 25, 2001) (holding that the defendant's language was "tasteless and undoubtedly offensive to many, [but] would not provoke the average person to retaliate under the circumstances[]"). There is a minor dispute regarding whether plaintiff raised his voice at Officers Walker and Venable but significantly, neither officer arrested plaintiff and there is no claim that plaintiff physically harmed or threatened to harm any of the officers.

Clarkson and Campbell claim that they were aware of the O'Kelly's bar incident and further allege that plaintiff's statements could be taken as threats by a reasonable officer. It is uncontroverted that authorities did not follow up on the 911 call until after plaintiff was arrested. Under these circumstances, it is not clear how Clarkson and Campbell could have been aware of what plaintiff supposedly said at O'Kelly's bar.

Viewed in the light most favorable to plaintiff, the court finds that plaintiff has met his burden to show that a genuine issue of material fact exists as to whether there was probable cause to arrest him and whether an objectively reasonable officer would mistakenly believe that probable cause exists. <u>See</u> <u>Buck</u>, 549 F.3d at 1281 ("In general, 'it is a jury question in a civil rights suit whether an officer had probable cause to arrest.'"); <u>See also</u> <u>Bruner v. Baker</u>,

506 F.3d 1021, 1028 (10th Cir. 2007) ("[W]here there is a question of fact or 'room for a difference of opinion' about the existence of probable cause, it is a proper question for a jury[.]").[15]

### c. Individual Liability for Arrest

Plaintiff asserts that all arrest defendants and Clarkson personally participated in his alleged unconstitutional arrest and thus are not entitled to qualified immunity. However, as pointed out, plaintiff must also demonstrate "substantial correspondence." In this case, several officers were present at the arrest and each performed separate acts. "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." Fogarty, 523 F.3d at 1162 (quoting Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997)). A plaintiff must allege personal involvement by the defendant officer. Id. Additionally:

> [A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

Weigel v. Broad, 544 F.3d 1143, 1153 (10th Cir. 2008).

---

[15]It is arguable that the court could find, as a matter of law, that plaintiff was arrested without probable cause. Nevertheless, the court will let a jury decide.

### Defendants Clarkson and Campbell

Clarkson and Campbell arrested plaintiff without a warrant at his grandparents' home. They knocked on the door and asked the woman who answered for plaintiff. Plaintiff was ordered to step outside and to place his hands on the wall. Plaintiff asserts that Campbell grabbed his hand, pulled him outside, and pushed him against the wall.[16] Clarkson handcuffed plaintiff and stated that he was being placed under arrest at the direction of the county attorney. Plaintiff was placed in Campbell's patrol car, who transported him to the jail.

Clarkson and Campbell personally participated in plaintiff's warrantless home arrest. As previously detailed, the parties dispute what facts were known by Clarkson and Campbell at the time of plaintiff's arrest. Therefore, Clarkson and Campbell are not entitled summary judgment based on qualified immunity.

### Supervisor Elston, Sgt. Allison, and Defendant Deill

Plaintiff does not allege that Supervisor Elston, Sgt. Allison, and Deill participated in physically arresting him. Plaintiff claims that one cover officer displayed his assault rifle. (Doc. 52-31 at 2). Sgt. Allison and Supervisor Elston admit they were each carrying a rifle, but deny pointing their weapons at plaintiff.

The evidence is uncontroverted that the decision to arrest plaintiff was made prior to Supervisor Elston, Sgt. Allison, and Deill's personal involvement. These defendants were not involved in the decision to arrest plaintiff. Rather, they were told by their superior officers to assist WPD in plaintiff's arrest, which occurred

---

[16]Campbell testified that plaintiff started to go back in the house.

after plaintiff's arrest had been ordered. Defendants went to plaintiff's grandparents' home merely to provide additional security for Clarkson and Campbell. There is no claim that excessive force was used. "Officers may rely on information furnished by other law enforcement officials to establish reasonable suspicion and probable cause for an arrest." Foote, 118 F.3d at 1424 (10th Cir. 1997). Although there are some minor disputes about what Supervisor Elston, Sgt. Allison and Deill were told prior to going to the grandparents' house, there is no evidence that these officers either knew or had reason to know that plaintiff's arrest was unjustified or that Clarkson and Campbell were violating plaintiff's constitutional rights.

No reasonable jury could find that these defendants had a "realistic opportunity to intervene to prevent the [alleged unconstitutional arrest] from occurring. Weigel, 544 F.3d at 1153. The court finds that plaintiff's claims against defendants are insubstantial. See Pearson, 129 S. Ct. at 815 (noting that qualified immunity is designed to protect governmental officials from "insubstantial claims"). Therefore, Supervisor Elston, Sgt. Allison, and Deill are immune from liability on plaintiff's 1983 unlawful arrest claim.

### County Attorney Smith

According to Chief DeVore, WPD regularly carried out arrests based upon oral communications from the county attorney without receiving paper warrants from him. Plaintiff argues that Smith effectively ordered plaintiff's arrest as a result of WPD's practice of relying on Smith's probable cause determination. Smith, however,

-24-

counters that it is WPD's responsibility to secure arrest warrants and further that he did not order plaintiff's arrest.  He told Lt. Weber and Chief DeVore only that probable cause existed to justify an arrest.

Smith relies on three cases to support his qualified immunity claim: <u>Douglas v. Dobbs</u>, 419 F.3d 1097 (10th Cir. 2005); <u>Coburn v. Nordeen</u>, No. 02-3249, 2003 WL 21662064 (10th Cir. July 16, 2003); and <u>Mink v. Suthers</u>, 482 F.3d 1244 (10th Cir. 2007).  <u>Mink</u> is an absolute immunity case and probably is no longer good law in light of <u>Van De Kamp v. Goldstein</u>, 129 S.Ct. 855, 861, 77 USLW 4100 (2009).  <u>Mink's</u> off-hand comment that a prosecutor "may be entitled to qualified immunity" is not persuasive because the court did not rule on the issue of qualified immunity.

<u>Douglas</u> does involve the question of whether a prosecutor is entitled to qualified immunity but it is factually distinguishable.  Dobbs, an assistant district attorney, authorized a police officer to submit a motion to a magistrate judge seeking approval to search Douglas' prescription records.  When Douglas sued, ADA Dobbs sought and was granted qualified immunity in the district court.  The Circuit affirmed, noting that Douglas cited no authority to support her claim that the Fourth Amendment is implicated when a district attorney advises law enforcement officers regarding proposed motions submitted to judges to obtain authorization to conduct searches.  The court also observed that whether a warrant is required to conduct an investigatory search of prescription records was unsettled (as of 2005) and therefore was not a clearly established right.  <u>Douglas</u>, 419 F.3d at 1103.  This case, in contrast, involves a warrantless arrest,

the parameters of which were clearly established in March, 2006.

Coburn likewise involved the action of a prosecutor although, once again, the facts are distinguishable. The prosecutor prepared a complaint and affidavit which plaintiff claimed contained information based on supposition. When the case reached the Circuit, the court observed that "[t]o be entitled to qualified immunity, defendant need only have possessed a reasonable belief that probable cause existed." Coburn, 2003 WL 21662064 at *2 (citing Anderson v. Creighton, 483 U.S. 635, 643-44 (1987)). The Circuit agreed with the district court's finding that the "plaintiff did not demonstrate that no reasonably competent official would have found indicia of probable cause ...." Id.

It is undisputed that Smith told Chief DeVore and Lt. Weber that he believed there was probable cause to arrest plaintiff for disorderly conduct. DeVore testified that Smith directed him to arrest plaintiff before something else happens. Smith denies this. This is a significant dispute because Kansas county attorneys and chiefs of police either know or should know the circumstances under which a person may be arrested for a misdemeanor. According to plaintiff, Clarkson told him that he was being arrested at the direction of the county attorney. Although Smith did not physically participate in plaintiff's arrest, he was an "affirmative link" in initiating it. A county attorney is not entitled to qualified immunity if he or she is the "affirmative link" to the constitutional deprivation. Reid v. Wren, Nos. 94-7112, 94-7123, 94-7124, 1995 WL 339401, at *2 (10th Cir. June 08, 1995). Therefore, a reasonable jury could find that Smith as such a link in plaintiff's alleged

-26-

unconstitutional arrest.  Smith is not entitled to summary judgment based on qualified immunity.

### d.   Strip Search

Plaintiff claims that it was unreasonable for strip search defendants and Clarkson to conduct a strip search.  The test of reasonableness under the Fourth Amendment "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Bell v. Wolfish, 441 U.S. 520, 559 (1979); Levoy v. Mills, 788 F.2d 1437, 1439 (10th Cir. 1986).  Because a strip search substantially intrudes upon an individual's personal rights, law enforcement officers must have considerable need for the search, i.e. the need outweighs the individual's right to privacy. Archuleta, 523 F.3d at 1283 ("'There can be no doubt that a strip search is an invasion of personal rights of the first magnitude.'") (citing Chapman v. Nichols, 989 F.2d 393, 395 (10th Cir. 1993)).  Furthermore, due to the degrading nature of strip searches, law enforcement must conduct them in the least intrusive manner.  Id.; Allen v. Board of Com'rs of County of Wyandotte, 773 F. Supp. 1442, 1448 (D. Kan. 1991).

Courts consider two primary factors in determining whether a strip search is reasonable: (1)"whether a detainee is to be placed in the general prison population and (2) whether there is reasonable suspicion that the detainee has concealed weapons, drugs, or contraband." Archuleta, 523 F.3d at 1284.

> Reasonable suspicion for a search is a minimum level of objective justification "based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." (Citations omitted).  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the

circumstances would be warranted in the belief that [her] safety or that of others was in danger." <u>Id.</u>

In <u>Archuleta</u>, the Tenth Circuit affirmed a district court's denial of qualified immunity after finding the defendant jailer's strip search of plaintiff to be unreasonable. The district court considered several factors including: (1) the plaintiff was not placed with the general population in jail; (2) law enforcement conducted three pat down searches prior to strip searching the plaintiff; (3) there was no evidence to suggest that the plaintiff possessed weapons, drugs, or contraband; and (4) the plaintiff was arrested for a municipal harassment violation, which the Circuit found was "hardly an offense 'commonly associated by its very nature with the possession of weapons[.]'" <u>Archuleta</u>, 523 F.3d at 1285. (Citations omitted).

In this case, plaintiff was arrested for disorderly conduct, a misdemeanor. According to Campbell, plaintiff said that he was going to take care of business while being transported to jail. Campbell said he took this statement as a threat. Plaintiff, however, testified that he stated: "I take care of my business[.]" (Doc. 122-4 at 3). Plaintiff meant that he pays his bills and is not a criminal. Even so, Bumpas was not aware of plaintiff's statement in Campbell's patrol car prior to his decision to strip search plaintiff.

Plaintiff was never placed in the general prison population. Bumpas believed plaintiff was pat searched prior to being strip searched. (Doc. 108-4 at 22). However, Bumpas testified that being patted down does not mean anything because he has found contraband on detainees after being frisked. The Tenth Circuit noted in <u>Cottrell v. Kaysville City, Utah</u>, 994 F.2d 730, 735 (10th Cir. 1993) that

-28-

"'[a]lmost anything that the examining officer could have found through [plaintiff's strip search] would have already been discovered during the pat down search.'"[17]

Deill claims that Sgt. Allison told him to treat plaintiff as possibly having a weapon.  However, nowhere in the record is there evidence that plaintiff ever possessed or even had access to a weapon. Moreover, it is apparent from the record that strip search defendants either did not know if plaintiff had a weapon or believed he did not have one at all.  Deill had no reason to believe plaintiff possessed a weapon when he was brought to the jail. (Doc. 123-13 at 20).  When asked if he had any reason to believe plaintiff had weapons, Bumpas testified:

> I didn't have any reason to believe he didn't.  I mean, that's just common practice, you know.  You don't know – if you come in the jail, I don't know whether you have anything or not until you've been searched, you know? (Doc. 108-4 at 13).

Dobbs does not remember whether or not he had any reason to believe that plaintiff was concealing a weapon.  (Doc. 123-14 at 27). Clarkson had no indication that plaintiff possessed a weapon.  (Doc. 122-8 at 6).

In light of strip search defendants and Clarkson's testimony, the court finds that no objectively reasonable officer would go so far as to believe plaintiff was concealing a weapon, drugs, or contraband because of plaintiff's statements.  No defendant has alleged that plaintiff physically harmed or even touched a police officer in any way.  Notably, Campbell and Clarkson did not search plaintiff's person

---

[17]In Cottrell, the plaintiff was wearing light summer clothes. Here, plaintiff was wearing a T-shirt and jeans.  (Doc. 105-4 at 37).

prior to placing him in the front seat of their patrol car. Plaintiff, who was already handcuffed, did not retrieve a weapon or contraband from inside Campbell's patrol car. Plaintiff has shown that a genuine issue of material fact exists as to whether his strip search was reasonable. <u>Archuleta</u>, 523 F.3d at 1286 ("[A] detainee who is not placed in the general prison population cannot be strip searched if the searching officer does not at least have reasonable suspicion that the detainee possesses concealed weapons, drugs, or contraband.").

   **e.   Individual Liability for Strip Search**

   Plaintiff claims that strip search defendants are not entitled to qualified immunity because each participated in his unconstitutional strip search by either conducing the strip search or providing additional security. As noted <u>supra.</u>, 42 U.S.C. § 1983 claims require personal participation. <u>Foote v. Spiegel</u>, 118 F.3d 1416, 1423 (10th Cir. 1997).

### Supervisor Bumpas

   Cowley County Jail's policy provides for <u>post</u>-booked detainees to be strip searched if they are unable to post or denied bond, prior to admittance into the general population. (Doc. 115-23).  Plaintiff was never placed with the general population.  Bumpas testified that he did not know whether or not plaintiff would post bond.  (108-4 at 45).

   Bumpas conducted plaintiff's strip search contrary to the jail's policies.  Plaintiff was strip searched <u>prior to</u> booking.  Bumpas claimed that it was common practice to strip search detainees to make sure there were no weapons or contraband.  However, common practice

or speculation alone do not justify strip searches of arrestees. See Chapman v. Nichols, 989 F.2d 393, 398-9 (10th Cir. 1993)(finding that no circuit case has upheld strip searches of minor offense detainees based upon common practice). Therefore, Bumpas is not entitled to qualified immunity.

### Defendants Dobbs and Deill

Dobbs and Deill witnessed plaintiff's strip search. They were responsible for securing the outside door to the holding cell. Dobbs was handed plaintiff's property from inside the holding cell. However, neither defendant made the decision to strip search plaintiff. Plaintiff does not claim that Dobbs or Deill were inside the holding cell or ordered him to remove his clothes.

No reasonable jury could find that Dobbs and Deill had a "realistic opportunity to intervene to prevent the [alleged unconstitutional strip search] from occurring. Weigel, 544 F.3d at 1153. Therefore, Dobbs and Deill are not individually liable for plaintiff's strip search and are entitled to summary judgment based on qualified immunity.

### Defendant Clarkson

Plaintiff has also asserted that Clarkson violated his Fourth Amendment right against unreasonable searches when he assisted Bumpas. Clarkson claims that he "did not even realize a strip search was being conducted." (Doc. 96 at 20). He considers plaintiff's search to be a plain view search as opposed to a strip search, apparently because it did not involve a body cavity search. The court rejects this strange distinction and finds that plaintiff was strip searched despite the fact that no body cavity inspection was done. Chapman,

-31-

989 F.2d at 398 (disagreeing that the "strip search of a minor traffic offender without reasonable suspicion was constitutional simply because the search did not include a visual body cavity inspection[]").

Clarkson argues that he played no role in authorizing or conducting plaintiff's strip search. He did not make the decision to strip search plaintiff. While it is true that he was inside the holding cell during plaintiff's strip search, he did not take part in strip searching plaintiff.

The court finds that Clarkson was present for two reasons: 1) to retrieve his handcuffs and 2) provide additional security because he was requested to do so.[18] He did not personally participate in or cause plaintiff to be strip searched. Plaintiff has not shown that he could have prevented plaintiff from being strip searched. Therefore, Clarkson is entitled to qualified immunity on plaintiff's strip search claim.

### f.   Failure to Train/Implement policies

Plaintiff argues that Winfield defendants, City and Chief DeVore, failed to train WPD officers and/or implement policies regarding lawful searches and seizures.[19] Arrest defendants and Clarkson respond that there was probable cause to arrest plaintiff and further that Cowley County jail correction officers or the sheriff are

---

[18]Bumpas testified that WPD or sheriff deputies often assisted correction officers in strip searches for safety reasons. (Doc 108-4 at 15).

[19]Plaintiff does not name Chief DeVore in Count 1 of his amended complaint, which specifies the defendants accused of either directing or carrying out plaintiff's arrest.

responsible for training and implementing policies regarding strip searches. City and Chief DeVore argue that they did not order plaintiff's strip search and have no control over the manner in which Cowley County correction officers conduct strip searches.

### City of Winfield

In order for City to be liable under § 1983, plaintiff must show: "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." Stuart v. Jackson, Nos. 00-1295, 00-1307, 2001 WL 1600722, at *10 (10th Cir. Dec. 17, 2001) "Plaintiff[] may also prove that 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious ... that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" Warner v. Grand County, 57 F.3d 962, 968 (10th Cir. 1995) (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)).

As previously noted, WPD had a custom of relying on oral communications by the county attorney. However, a custom of seeking and relying on advice from the county attorney, in and of itself, is not unconstitutional. Hollingsworth v. Hill, 110 F.3d 733, 744 (10th Cir. 1997) (finding that the injury was caused by the decision itself, not the sheriff's custom of seeking legal advice and opinion from the district attorney).

"[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the

constitutional deprivation." <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 824 (1985) (plurality & Brennan, J., concurring in part & concurring in the judgment). Still, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986).

Plaintiff has not alleged that WPD's custom was the direct causal link to more than a single constitutional violation, i.e. his own alleged unconstitutional arrest. There is no evidence in the record that WPD's custom or training resulted in other unconstitutional arrests. <u>See</u> <u>Brown v. Gray</u>, 227 F.3d 1278, 1286 (10th Cir. 2000) (stating that a single incident of excessive force coupled with some other evidence of inadequacy is sufficient even if the policy itself is not unconstitutional). Chief DeVore and/or Smith's decision to arrest plaintiff was discretionary. <u>See</u> <u>Pembaur</u>, 475 U.S. at 482 ("The fact that a particular official-even a policymaking official-has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). Therefore, the court finds that the City of Winfield is entitled to summary judgment on plaintiff's 1983 claim for failure to train and/or implement policies.

### Chief DeVore

Plaintiff is suing Chief DeVore in his individual capacity.

In order to show a supervisor's failure to adequately train law enforcement officers amounted to a constitutional violation, the superior must have participated or acquiesced in the claimed constitutional deprivations. (Citations omitted). "Unless a supervisor has established or utilized an unconstitutional policy or custom, a plaintiff must show that the supervisory defendant breached

-34-

a duty imposed by state or local law which caused the constitutional violation."[20]

Stuart v. Jackson, Nos. 00-1295, 00-1307, 2001 WL 1600722, at *10 (10th Cir. Dec. 17, 2001) (citing Meade v. Grubbs, 841 F.2d 1512, 1527-8 (10th Cir. 1988)).

Plaintiff has provided no evidence that Chief DeVore failed to train WPD officers in effecting constitutional arrests. Plaintiff's argument focuses on Chief DeVore's regular practice of relying on oral communications by the county attorney without receiving paper warrants, which is contrary to WPD's written policy, requiring that "[w]henever possible, a warrant will be obtained prior to making an arrest."[21] (Doc. 52-30 at 1).

As noted supra., it is not unconstitutional to seek and rely on legal advice from the county attorney. Furthermore, under certain circumstances, it is not unconstitutional to arrest suspects without paper warrants. Other than plaintiff's conclusory statement that Chief DeVore failed to train WPD officers, plaintiff has not alleged Chief DeVore breached a duty required by state or local law.

Plaintiff does not contend that WPD's written policy on strip and body cavity searches is unreasonable.[22] (Doc. 52-32). Chief DeVore

---

[20]A supervisor may also be liable under section 1983 if his personal participation, exercise of control or direction, or failure to supervise is an "affirmative link" to the constitutional deprivation. Meade, 841 F.2d at 1527. However, plaintiff has only alleged Chief DeVore failed to train and implement adequate policies.

[21]Plaintiff does not contend that WPD's written policy is unconstitutional.

[22]WPD's policy provides, "No person arrested or detained solely for a traffic violation or non-violent misdemeanor will be strip searched unless there is probable cause to believe that the individual is concealing a weapon or evidence." (Doc. 52-32).

testified that WPD officers are required to follow the Cowley County jail procedure when assisting in a strip search, which is typically at the request of county correction officers.

The court finds that plaintiff has not shown that Chief DeVore's failed to train WPD officers. See Stuart, 2001 WL 1600722 at *10 (holding that the plaintiff's bare allegations for failure to train do not meet the threshold required by Saucier). Plaintiff has also failed to show that Chief DeVore's custom of deferring to jail officials for the decision whether to strip search was unconstitutional or that he breached a duty imposed on him by state or local law. Chief DeVore had no control over the decision to strip search plaintiff or the manner in which it was conducted. Therefore, Chief DeVore's is entitled to summary judgment on plaintiff's failure to train claim.

### Sheriff Odell

Plaintiff next argues that Sheriff Odell, who also is being sued in his individual capacity, failed to train Cowley County sheriff deputies and correction officers and/or implement policies, which caused his alleged unconstitutional arrest and strip search.

Plaintiff has produced no evidence that Sheriff Odell inadequately trained his deputies or failed to implement policies that resulted in his alleged unconstitutional arrest. Plaintiff has not shown that Sheriff Odell's policies were unconstitutional or that Sheriff Odell himself breached a duty imposed on him by state or local law. At most, plaintiff has shown that Sheriff Odell's deputies participated in his arrest at WPD's request. "Police officers are entitled to rely upon information relayed to them by other officers

-36-

in determining whether there is reasonable suspicion to justify an investigative detention or probable cause to arrest." <u>Oliver</u>, 209 F.3d at 1190.

The Cowley County jail's intake policies instruct correction officers to frisk search (pat down) all detainees immediately upon entering the booking area. For combative detainees, correction officers must be prepared to use the X26 taser, conduct a frisk search of detainee, and remove any person property prior to restraints being removed. <u>After</u> being booked into jail, detainees are to be strip searched if they have are unable to post or denied bond. (Doc. 115-22). "Strip searches shall be performed on a routine basis, when: (i) [a]fter an arrestee has been booked, prior to admittance into general population." (Doc. 115-23).

The court finds that Sheriff Odell's policies regarding strip searches did not lead to plaintiff's alleged unconstitutional strip search. On the contrary, the strip search was in violation of the policy. "Courts have consistently recognized a distinction between detainees awaiting bail and those entering the jail population when evaluating the necessity of a strip search under constitutional standards." <u>Cottrell</u>, 994 F.2d 730 at 735. By strip searching plaintiff <u>prior</u> <u>to</u> booking, Sheriff Odell's employees acted contrary to his policies.

Plaintiff does not allege that Sheriff Odell's methods of training violate any applicable law. Plaintiff has not contested Sheriff Odell's testimony that he was unaware that plaintiff was strip searched. (Doc. 115-10, p. 28). As such, the court finds that plaintiff has produced no evidence that Sheriff Odell breached any

duty imposed on him by state or local law.  Therefore, Sheriff Odell is entitled to qualified immunity on plaintiff's claims.

**V. CONCLUSION**

For the reasons stated more fully herein, Winfield defendants' motion for summary judgment (Docs. 38, 96) is granted as to City and Chief DeVore and denied as to Clarkson.  Arrest defendants motion for summary judgment (Doc. 104) is granted as to Supervisor Elston, Sgt. Allison, and Deill and denied as to Campbell.  Strip search defendants motion for summary judgment (Doc. 107) is granted as to Dobbs and Deill and denied as to Bumpas.  Smith and Sheriff Odell's motion for summary judgment (Doc. 114) is granted as to Sheriff Odell and denied as to Smith.

Because defendants City of Winfield, Chief DeVore, Supervisor Elston, Sgt. Allison, Deill, Dobbs, and Sheriff Odell's motions for summary judgment on plaintiff's 1983 claims are granted, the court declines to exercise jurisdiction of plaintiff's state claims against these defendants.  The claims are dismissed, without prejudice.  28 U.S.C. § 1367(c)(3).

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or

-38-

argued is inappropriate.  <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in <u>Comeau</u>. The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.



     IT IS SO ORDERED.

     Dated this  23rd  day of March 2009, at Wichita, Kansas.




                                   s/ Monti Belot
                                   Monti L. Belot
                                   UNITED STATES DISTRICT JUDGE